WEBB ANDERSON, AS THE       *
SURVIVING CHILD OF JESSE   *
JAMES ANDERSON, DECEASED,   *     CIVIL ACTION FILE NO:
AND DONNA ANDERSON, AS     *     1:21-cv-03226-AT
ADMINISTRATOR OF THE       *
ESTATE OF JESSE JAMES         *
ANDERSON,                     *
                                *
        Plaintiffs,           *
                                *
vs.                           *
                                *
THE UNITED STATES OF AMERICA,   *
                                *
        Defendant.         *

## PLAINTIFFS' MOTION FOR SANCTIONS

In recent weeks, it has become clear that the Government and its lawyers have engaged in a years-long, coordinated effort to deceive Plaintiffs and the Court about the facts of this case and the magnitude of the damages at issue. The concealed witness statements just recently disclosed on the threat of an *in-camera* review have revealed that Defendant has raised claims of privilege in bad faith without any justification, that Defendant has offered and cited to this Court expert testimony that is the opposite of the truth, and that Defendant knowingly misled Plaintiffs and concealed the names of at least two individuals consulted about the

insertion of Decedent's Dobhoff tube. Because the conduct of Defendant is so egregious and willful, sanctions are appropriate.

## I.    This Case

As the Court knows, this case arises from the errant placement of a feeding tube into Mr. Anderson's windpipe.  The tube was misplaced by Pam Brown, a nurse at the VA, who had never before placed such a tube and accordingly expressed her discomfort in doing so when she was ordered to place the tube in Mr. Anderson.  *See* Doc. 98, Brown Dep., at 97:15–98:6. However, Nurse Brown eventually disregarded her reluctance to place the tube and attempted the placement after a prolonged beratement of her by a resident doctor with a bad attitude who insisted the tube be placed by nurses. *See* Doc. 98, Brown Dep., at 99:5–8, 42:6–13; Doc. 101-5, Gouge Dep., at 40:7–41:4, 57:17–24; Ex. 1, Provider Statements, at 13–14. When the tube was placed by Nurse Brown, Mr. Anderson began to show the unmistakable signs of a misplaced Dobhoff tube.  Notably, Mr. Anderson began to "show signs of increased anxiety, coughing, and diaphoresis" with increased heart rate and low oxygen saturation. *See* Doc. 98-2, Brown Note, at 2; Ex. 1, Provider Statements, at 5.

During the ill-conceived procedure, due to her total lack of training and experience, Nurse Brown failed to recognize the obvious signs of a misplaced

tube.[1]  Because she failed to recognize the signs of respiratory distress, Nurse

Brown and her colleagues significantly delayed calling a Rapid Response team and

the timely initiation of a Code.  Instead, Nurse Brown and her colleagues called Dr.

Gouge and relayed the events and signs of respiratory distress to him. *See* Doc. 98-

2, Brown Note, at 2; Ex. 1, Provider Statements, at 5; *Id.*, at 11 (noting a rapid

response was called only after oxygen saturation dropped to 80 percent). Dr.

Gouge, a resident who himself was not trained on the placement of a Dobhoff tube,

also did not recognize the peril Mr. Anderson was in with his respiratory distress

when he was called.  Accordingly, Dr. Gouge did not order the nurses to withdraw

the tube or to call a Rapid Response Team or a Code.  Instead, in response to Mr.

Anderson's inability to breathe, Dr. Gouge ordered the administration of an IV

dose of Ativan—a respiratory depressant for a patient already in respiratory

distress. Following the IV administration of the Ativan, Mr. Anderson became

unconscious, began to discolor, and his heart arrested. *See* Ex. 1, Provider

---

[1] The number one risk associated with placing a Dobhoff tube is placing it into the trachea (windpipe) and lung of a patient.  Such misplacement can lead to profound respiratory distress which, if not immediately resolved, will produce a brain injury and death.  In fact, the inability to adequately breathe can result in a brain injury in just a few minutes. *See* Doc. 93-3, Schweiger Aff., at 9. Hence, when placing a Dobhoff tube, the provider must be on high alert for any signs of respiratory distress (*i.e.* signs of breathing problems like coughing, sweating, oxygen desaturation, changes in vital signs, etc.).  If any such signs are demonstrated, the tube should be immediately withdrawn. *See Id.*, at 8–9.  If withdrawing the tube does not immediately resolve the respiratory distress, other interventions should commence immediately. *Id.*, at 9.

Statements, at 5, 14. These failures combined to cause a massive brain injury for Mr. Anderson who died a few days later.[2]

Following Mr. Anderson's death, apparently due to the egregiousness and the horror of the events surrounding his death, several of the involved witnesses prepared statements to memorialize what had happened. *See* Ex. 1, Provider Statements, *passim*; Doc. 96-1, Watson Dep., at 59:8–60:6. The statements identified several witnesses involved in the incident and also detailed actions that were taken in connection with the events of the day. *See* Ex. 1, Provider Statements, *passim*. The Government refused to disclose such statements to Plaintiffs, claiming that the statements were privileged pursuant to 38 U.S.C. § 5705, which requires specific showings that documents were made as part of a quality assurance program specifically designated by regulations, such as focused reviews designated at the outset of a review process as protected. When the Plaintiffs ultimately challenged the claims of privilege and the Court ordered the

---

[2] After consultation with VA medical doctors and being given a "no hope" prognosis for his father, Plaintiff Webb Anderson authorized the withdrawal of life support. That process was tortured by more of the VA's bungling where the family was left standing at the bedside of their father's corpse for over an hour and a half waiting on a VA doctor to pronounce Mr. Anderson dead. *See* Doc. 101-3, Belcher Dep., at 28:1–12. Following the death of Mr. Anderson, the VA met with the Anderson family, essentially admitted their neglect, and offered the Anderson family $750,000. The family declined, eventually hired counsel who sent in the Forms SF-95 on behalf of Plaintiffs. The Government then sat on the Notice for some years before finally sending an offer of $350,000. *See* Ex. 2, Response to Administrative Demand.

production of the statements for *in-camera* review, the Government finally disclosed the statements to Plaintiffs. In fact, it has become clear that such statements never met the elements of 38 U.S.C. § 5705 and should never have been withheld. *See, e.g.*, Doc. 96-1, Watson Dep., at 59:8–60:6 (noting that her statement was not prepared at the specific direction of any one person); Ex. 1, Provider Statements, at 1 (noting that the VA is no longer asserting a privilege).[3]

## II.     Defendant's Bad Faith Claims of Privilege

Throughout this case, the Defendant has claimed privilege over documents and information pursuant to either an "internal investigation" statutory privilege,

---

[3] On the day Defendant provided the provider statements to Plaintiffs following the Court's Order for Defendant to brief its factual and legal support for its claims of privilege, *see* Doc. 102, counsel for Defendant affirmed that Defendant had followed up with Nurse Brown about the separate statement she prepared following the incident, and she stated that Defendant "will provide it to [Plaintiffs] upon receipt if she has it." *See* Ex. 3, September 29, 2023 Email from Defense Counsel. Despite this assurance, Defense counsel stated on October 27, 2023 that she "received the information from Nurse Brown but some of the documents appears [sic] to be privileged," stating that she would review and "provide [Plaintiffs] any responsive documents by Tuesday." *See* Ex. 4, October 27, 2023 Email from Defense Counsel. Instead, on Tuesday, October 31, the only document Defendant provided was the statement of Nurse Brown included in the provider statements already disclosed and a statement that Defendant would be "updating the privilege log this week with any documents being withheld." *See* Ex. 5, October 31, 2023 Email from Defense Counsel. Mr. Anderson's death occurred nearly seven years ago, yet Defendant is allegedly just now acquiring and withholding these documents. There is no excuse for this either intentional concealment or reckless indifference to the truth, neither of which the rules abide without consequences.

the work-product doctrine, or the attorney–client privilege. However, it has now become clear to Plaintiffs that many—if not all—of Defendant's assertions of privilege were made in bad faith to obstruct Plaintiffs' access to relevant documents, witnesses, and evidence in this litigation. From the provider statements that have been produced to Plaintiffs thus far, it is apparent that the statements do not meet the requirements of 38 U.S.C. § 5705; indeed, none of the statements contain any designation that they were made pursuant to anyone's direction or any type of pre-designated formal review. *See* Ex. 1, Provider Statements, *passim*.

One of the most blatant examples of this unfounded claim of privilege is revealed in the statement of Nurse McKethan, the Code Team reporter.[4]  Prior to the deposition of Nurse McKethan, Plaintiffs were unaware that she had written any statement following the events that led to Mr. Anderson's death. During the deposition, at which counsel for Defendant and personal counsel for the witness appeared, Plaintiffs' counsel inquired as to what documents and to whom the witness had spoken in preparation for the deposition. *See* Doc. 101-7, McKethan Dep., at 9:5–24. After the witness initially stated she had not reviewed any records, counsel for Defendant clarified that she, on behalf of Defendant, had in fact

---

[4] As detailed in Section III, *infra*, the McKethan Statement the Government had withheld under an improper claim of privilege contains critical details that refute the timeline and order of events continually advanced by Defendant in this Action.

reviewed documents with the witness. *Id.*, at 10:1–9. At the time, Defendant's

attorney also represented that Nurse McKethan had reviewed a statement she

herself had given as part of "the VA's internal investigation" and that Defendant

"considered that information to be privileged" and would be providing a privilege

log for it. *Id.*, at 48:22–49:6. Defense counsel explained that the provider statement

was not originally listed on its privilege log because Nurse McKethan only

recently sent a copy of the statement to Defendant's counsel before the deposition.

*Id.*, at 50:3–10. Following the revelation of the statement, Plaintiffs requested the

information sufficient to evaluate the claim of privilege be placed on a privilege

log, which Defendant assured it would do. *Id.*, at 49:9–15; 55:22–56:9. *See also*

*Carnes v. Crete Carrier Corp.,* 244 F.R.D. 694, 698 (N.D. Ga. 2007). It is this

document that Defendant, despite its promise to do so, did not list on a privilege

log until Plaintiffs requested the issue to be heard by the Court.

Given the requirement of a factual basis to claim a privilege over a

document, one would hope that an attorney claiming such a privilege would have

seen the subject document, reviewed the document, or at least briefly viewed its

contents. Yet, shockingly, counsel for Defendant now claims that she does "not

recall being given [the McKethan] statement or reading it at the time" it was given

to her, that she read Nurse McKethan's statement "in early September for the first

time" and that Defendant was "not aware of the content of Nurse McKethan's

statement until September of 2023." *See* Ex. 6, October 2, 2023 Emails between counsel.

What these perplexing and contradictory statements of defense counsel show is that one of two courses of action have been afoot in this case: either (1) counsel for Defendant, now owning up to her conduct, had made unfounded objections in bad faith, claiming privilege over documents she had never viewed to obstruct Plaintiffs' access to discovery without even a cursory inquiry into the documents over which she was claiming privilege, or (2) counsel for Defendant did view the McKethan statement at the time of the deposition, and in the preparation of Nurse McKethan for the deposition proceeded to solicit and procure expert testimony in direct conflict with the timeline shown by the statement and has now falsely claimed that she had never reviewed the statements prior to September of 2023. Neither alternative is justifiable, and both possibilities evince Defendant's willful obstruction to Plaintiffs' access to information in this case and are sanctionable conduct. *See In re Blue Cross Blue Shield Antitrust Litig.*, 2:13-CV-20000-RDP, 2018 WL 2676165, at *4 (N.D. Ala. Jan. 29, 2018) (noting that "parties should not, in any event, advance a claim of privilege that is unfounded" and that bad faith, unfounded claims of privilege may lead to sanctions under a court's inherent authority).

### III. **Defendant's Solicitation of and Citation to Knowingly Unfounded Expert Testimony**

Defendant now argues to this Court that Plaintiffs' expert, Nurse Inhulsen, agreed that "during insertion up until the time [Mr. Anderson] got back into bed, there [was] no indication that Mr. Anderson was coughing or showing any signs of anxiety at the time." Doc. 95, Statement of Material Facts, at ¶ 29. Defendant also solicited and offered testimony from its expert witness, Donna Jones, in rebuttal of Plaintiffs' expert, that there was "no documentation or testimony Mr. Anderson became '*acutely anxious' IMMEDIATELY* after the insertion of the [Dobhoff Tube]." *See* Doc. 91, at 4. What the concealed statements now reveal, though, is that "during insertion" of the Dobhoff tube, Mr. Anderson "seemed to be anxious," including both gagging and watering eyes. *See* Ex. 1, Provider Statements, at 5.

Similarly, Defendant argues to this Court that a "rapid response should be initiated when a patient's status changes or their oxygen saturation drops below 90% despite supplementation," Doc. 95, at ¶ 55, yet it also argues that the VA's "nursing staff called for a rapid response as soon as Mr. Anderson showed signs of respiratory distress and his vitals began declining." *Id.*, at ¶ 53. One of the statements previously withheld by Defendant, though, reveals that while Mr. Anderson's pulse oximetry may have been 96% immediately following the insertion of the Dobhoff tube, the VA staff allowed Mr. Anderson's oxygen saturation to significantly deteriorate prior to calling a rapid response, despite the

nurse manager and charge nurse being present in the room. *See* Ex. 1, Provider Statements, at 10–11 (noting patient's oxygen saturation at 80% prior to call of rapid response team). Indeed, multiple witnesses note that following the insertion of the Dobhoff tube, Mr. Anderson had changed color, from "red" to "gray in color" or "pale" prior to the rapid response being called. *Id.*, at 5, 8, 14. Following this change in color, instability, sweating, and changed vital signs, Ativan was given to Mr. Anderson prior to any rapid response being called as well. *Id.*, at 5.

Throughout the entirety of this case, questioning has revolved around the administration of the Ativan and the timing of the code and the rapid response in relation to the insertion of the Dobhoff tube and the administration of the Ativan. Defendant has put forth witnesses offering opinions that the Ativan was never given to Mr. Anderson, who argue that the term "given" at 15:21 really means that the doctor had simply "ordered" the Ativan at 15:21. *See* Doc. 105-1, Klancke Dep., at 170:2–13; 175:21–22 ("Actually, I don't believe [Ativan] was ever given. I think 1632, the order is cancelled."). In Dr. Klancke's report as well, he advances this theory based on Dr. Lagregen's testimony that Ativan was "marked as given" at 16:32. Defendant even continues to advance this theory even through its Motion for Summary Judgment. *See* Doc. 92 ("Ativan was given at 16:32.").

The sole basis for the Defendant's late (and therefore inconsequential) administration theory is the deposition testimony of Dr. Lagergren; indeed, defense

counsel interrupted Plaintiffs' deposition of Dr. Lagergren specifically to interpose the medical administration record during the establishment of a timeline for the administration of Ativan, despite knowing that Nurse Brown clearly recalled and documented administering the Ativan prior to the rapid response or the code. *Compare* Doc. 97, Lagergren Dep., at 87:1–17; 100:16–22 *with* Ex. 1, Provider Statements, at 5 ("[Nurse Brown] gave [Mr. Anderson] 0.5mg of diluted Ativan IV.").

For years, as well, the Government has advanced a timeline of events that is directly refuted by the withheld witness statements. *See, e.g.*, Doc. 105-2, Jones Dep., at 134:10–24; Doc. 105-1, Klancke Dep., at 160:2–24; Doc. 105-3, Mitros Dep., at 94:1–12. Specifically, Defendant supported and advanced expert testimony intended to refute Plaintiffs' expert's testimony that the call of the code at 15:30 was impossible. *See* Doc. 91, at 7. Defendant allowed its expert to opine that "[t]he code sheet documentation is not false" and that the medical code was in fact called at 15:30. All the while, however, the statements of Nurse McKethan and Nurse Watson, in the possession of Defendant throughout this case, clearly demonstrate that the code was clearly and indisputably not called until at least 15:40, and likely as late as 15:44. *See* Ex. 1, Provider Statements, at 8 ("code call made at 1544"); *Id.*, at 16. It is now clear that Defendant caused and allowed its experts to advance such theories of the case pointing to the "absence" of evidence

on certain topics when such evidence was in the hands of the Defendant which it possessed throughout the discovery process and withheld from Plaintiffs on a baseless theory of privilege. Accordingly, not only did the non-production and non-disclosure of such statements prejudice Plaintiffs, but Defendant also actively tried to leverage the concealment in order to defeat Plaintiffs' case based on a theory of events they knew was plainly the opposite of the truth.

### IV.   Defendant's False Discovery Responses and Concealment of Witnesses

Finally, there are witnesses listed in the provider statements whose involvement in the situation giving rise to this Action was yet unknown to Plaintiffs. Mentioned multiple times in the statement of Pamela Brown is a "Dr. West," who was not disclosed by Defendant as a person with discoverable information. *Cf.* Doc. 11, Initial Disclosures of Defendant. Similarly, the provider statement of Nurse Brown lists a Nurse Patani, whose involvement in this case was unknown to Plaintiffs prior to the production of the statement. Plaintiffs asked Defendant specifically in discovery to identify "all individuals who were consulted . . . regarding the placement of the Dobhoff tube," and Defendant referred to Nurse Brown's note only, knowing that it did not contain the name of Dr. West as shown

in the statement they possessed.[5] *See* Ex. 8, Plaintiffs' First Interrogatories; Ex. 9, Defendant's Objections and Responses to Plaintiffs' First Interrogatories.

Pursuant to Federal Rule of Civil Procedure 37(c)(1), a party failing to identify a witness is subject to sanctions, including, after opportunity to be heard, the striking of pleadings or rendering a default judgment against the disobedient party. "In determining whether sanctions should be imposed under Rule 37(c), courts typically consider the non-disclosing party's explanation, the importance of the evidence/disclosure, and the prejudice to the opposing party." *Collins-Williams v. Contour Eastwyck LLC*, 1:20-CV-3129-CAP, 2022 WL 17828934, at *105 (N.D. Ga. Dec. 15, 2022). In this case, Defendant has offered no explanation for its sudden about-face decision to abandon its claim of privilege when ordered by the Court to justify its claim. *See* Doc. 102 (ordering Defendant to file a brief addressing the legal and evidentiary basis of the privileges asserted). Further, the witnesses concealed are not those who happen to have incidental or hearsay

---

[5] In fact, the Government did not list several of the key witnesses in this case in its first iteration of initial disclosures. Indeed, while they list Nurse Thomas as someone who "offered to assist Pamela Brown," Defendant did not even list Pamela Brown herself within the first initial disclosures. *See* Doc. 11, at 7. And, when Plaintiffs identified the names of witnesses they wanted to depose or interview, the Government's initial response was to express its desire to get to the witnesses first, a well-known, but clearly inappropriate tactic of "woodshedding." *See* Doc. 114-1, June 9, 2022 Email from Defense Counsel; *see also* Ex. 7, *Thomas v. Pine Manor Nursing Home, Inc.*, Superior Court of Muscogee County Order regarding solicitation of witnesses.

knowledge of the events giving rise to this Action; according to the statement of Nurse Brown, the witnesses hidden by Defendant were directly consulted about the Dobhoff tube: the central issue in this case.

Plaintiffs are also prejudiced by the non-disclosure of these witnesses. While "[a] discovery mistake is harmless if it is honest, and is coupled with the other party having sufficient knowledge that the material has not been produced," Plaintiffs had no knowledge of these providers or their involvement in the Dobhoff tube process all throughout discovery. *Go Med. Indus. Pty, Ltd. v. Inmed Corp.*, 300 F. Supp. 2d 1297, 1308 (N.D. Ga. 2003*), aff'd sub nom. Go Med. Indus. Pty., Ltd. v. Inmed Corp.*, 471 F.3d 1264 (Fed. Cir. 2006). Defendant had the concealed statements in its possession through the entire case, yet never once did it mention the names of these providers in discovery or allow Plaintiffs the benefit of deposing them or asking other providers about their involvement or providing their testimony to experts. Instead, Defendant listed no objection to the provision of witness names listed only in internal documents, nor did it state in its discovery response that any information was withheld; Defendant's response refers Plaintiffs only to a medical document Defendant knew did not reference at least two individuals listed in Nurse Brown's written provider statement.[6] Such false

---

[6] Defendant attempts to characterize Plaintiffs' timeline of discovery in this case as "misleading" due to Plaintiffs noting that on February 25, 2022, Defendant objected to Plaintiffs' interrogatory requesting the purpose of any review and

discovery responses, when paired with Defendant's advancement of unsupported and knowingly false theories of the case and baseless claims of privilege, make clear that Defendant must be sanctioned for its conduct during this litigation.

This concealment has just been revealed after all experts have been secured, paid, deposed and discovery has closed. The Government effectively misled Plaintiffs into believing that the statements were legitimately privileged/protected by citing to 38 U.S.C. § 5705, objecting at every turn in every deposition that the statements were given pursuant to a legitimate investigation, all of which on its face seemed believable. Plaintiffs' suspicion as to the legitimacy of the claims of

---

identification of documents generated therein and referred to Nurse Brown's note for individuals consulted on Dobhoff placement. *See* Doc. 104, at 3; Doc. 113-1, at 3. However, these are two separate Interrogatories: Interrogatory No. 3 requested identification of "all individuals who were consulted . . . regarding the placement of the Dobhoff tube," while Interrogatory No. 12 requested information regarding the purpose and origination of any peer review. *See* Ex. 8, Plaintiffs' First Interrogatories. As Plaintiffs previously noted, *see* Doc. 104, at 3, Defendant did object to Interrogatory No. 12, citing to 38 U.S.C. § 5705 without providing any purpose of the review; however, as Defendant admits, it responded without objection to Interrogatory No. 3 by referring to Nurse Brown's note. *See* Ex. 9, Defendant's Responses to Plaintiffs' First Interrogatories. Because Plaintiffs received a substantive answer to the discovery request, they had no reason to send a good faith letter seeking additional individuals. As the Georgia Supreme Court has recognized regarding discovery, "[w]hen a party receives a substantive answer to a discovery request, they are entitled to believe that answer, and they are not required to file a motion to compel or seek clarification of that substantive response in order to obtain sanctions." *Resurgens, P.C. v. Elliott*, 301 Ga. 589, 595, 800 S.E.2d 580, 585 (2017); *see also Githieya v. Glob. Tel*Link Corp.*, 608 F. Supp. 3d 1290, 1320 (N.D. Ga. 2020) ("The documents [the defendant] referred Plaintiffs to were misleading and did not provide a complete response to Plaintiffs' question.").

privilege and protection only began in earnest when it became clear that the Government was using the statements to improperly coach witnesses and that the statements were retained in some cases by the witnesses themselves.

## V.    **Relief Requested**

What the evidence that has now come to light in this case shows is that Defendant willfully concealed witnesses from Plaintiffs, deliberately advanced false theories of the events, and knowingly asserted baseless claims of privilege, all of which were meant to obstruct Plaintiffs' discovery of the truth in this case. While sanctions are necessary for the false discovery response alone, the additional vexatious conduct in this litigation multiplies the need for sanctions to right the Defendant's wrongs. *See Watts v. Silverton Mortgage Specialists, Inc.*, 1:17-CV-3574-SCJ, 2019 WL 13214225, at *3 (N.D. Ga. Mar. 21, 2019) ("In addition to false or inconsistent statements, evasive and uncooperative conduct can constitute sanctionable, bad-faith conduct.").

Defendant now, through its filing of a Motion for Summary Judgment, *see* Doc. 92, has asked this Court to totally and completely end Plaintiffs' case based on some of these same unsupported theories of the case as detailed above. Because of the misconduct and fraud Defendant has willfully, knowingly, and deliberately tried to advance to Plaintiffs and this Court, the Court has the power to sanction Defendant under both Federal Rule of Civil Procedure 37 and under its inherent

power. *See Chambers v. NASCO, Inc.*, 501 U.S. 32, 49 (1991) ("[T]he inherent power of a court can be invoked even if procedural rules exist which sanction the same conduct.").

In this case, Defendant has solicited statements from experts it knew to be unsupported by the evidence and advanced claims of privilege that were completely devoid of factual and legal support. Even if some of Defendant's statements were made in a certain, calculated way that they are technically not false,[7] they are nonetheless intentionally misleading and do not protect Defendant from sanctions. *See In re Mroz*, 65 F.3d 1567, 1575 (11th Cir. 1995) (finding that even conduct that may be passable by the Rule 11 standard, if conducted in bad faith, may subject a party to sanctions; just because a claim does not violate Rule 11, "it does not necessarily mean that a party will escape sanctions under the court's inherent power.").

---

[7] For example, in Defendant's Statement of Undisputed Material Facts, it cites to Dr. Lagergren's deposition for the proposition that Ativan was given at 16:32 (which is nearly an hour after anyone alleges the Code and the injury had occurred, thus making the Ativan irrelevant to the case). *See* Doc. 95, at ¶116. While Defendant knows the deposition testimony of Nurse Brown, the other medical records, and now her provider statement prove that the Ativan was given prior to the call of the code or the rapid response, Defendant nonetheless continues to attempt to deceive the Court. *See* Doc. 98-2, Brown Note, at 2 (noting Mr. Anderson was "given Ativan"); Doc. 98, Brown Dep., at 54:8–16; Ex. 1, Provider Statements, at 5.

Due to the flagrant conduct of Defendant, Plaintiffs request that this Court strike Defendant's answer and end its case—exactly the result it has prayed this Court deliver to Plaintiffs. Plaintiffs do not make such a Motion lightly; however, it is clear that Defendant has distorted and misrepresented the facts in this case and will continue to do so. The evidence that has now come to light bears on Plaintiffs' entire approach to the case, and it will change the approaches of both the experts and the attorneys in this case. No other sanction can remedy the time, effort, and expense that has been spent attempting to dismantle Defendant's false theories of the case that could have been expedited or eliminated through honest and forthcoming conduct by Defendant.

## VI.    Conclusion

"[T]hose who lie, evade and fail to tell the *whole* truth obviously enjoy an advantage over honest litigants. The victimized opponent winds up . . . consuming substantial resources to respond to and 'undo' the victimizer's lies and distortions." *Forsberg v. Pefanis*, 634 Fed. Appx. 676, 680 (11th Cir. 2015) (quotation omitted) (emphasis and ellipsis in original). The perversion of the truth throughout this case has caused Plaintiffs to expend great resources on expert depositions unwinding timelines and theories that are clearly refuted by the documents Defendant wrongfully withheld and unjustifiably claimed privilege.

Plaintiffs respectfully request that the Court set an in-person hearing on this matter at the Court's earliest convenience, strike the Defendant's answer, and enter default judgment in favor of Plaintiffs.

Respectfully submitted, this 1st day of November, 2023.

/s/ Matthew E. Cook
Matthew E. Cook
Georgia Bar No. 184399
Kate S. Cook
Georgia Bar No. 280584
Nathan Nicholson
Georgia Bar No. 390553
Joshua L. Bearden
Georgia Bar No. 148312
2. Attorneys for Plaintiffs
Cook Law Group, LLC
P.O. Box 2415
Gainesville, Georgia 30503
Telephone: (678) 928-3899
Email: matt@cook-lawgroup.com
kate@cook-lawgroup.com
nathan@cook-lawgroup.com
josh@cook-lawgroup.com

Justin Berelc
Georgia Bar No.790638
Attorney for Plaintiffs
Berelc Law Office, P.C.
P.O. Box 786
Lavonia, GA 30553
Telephone: (706) 536-0518
Email: justin@berelclawoffice.com

*Attorneys for Plaintiffs*

IN THE UNITED STATE DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| WEBB ANDERSON, AS THE | * | |
| SURVIVING CHILD OF JESSE | * | |
| JAMES ANDERSON, DECEASED, | * | CIVIL ACTION FILE NO: |
| AND DONNA ANDERSON, AS | * | 1:21-cv-03226-AT |
| ADMINISTRATOR OF THE | * | |
| ESTATE OF JESSE JAMES | * | |
| ANDERSON, | * | |
| | * | |
| Plaintiffs, | * | |
| | * | |
| vs. | * | |
| | * | |
| THE UNITED STATES OF AMERICA, | * | |
| | * | |
| Defendant. | * | |

## **CERTIFICATE OF SERVICE**

I hereby certify that on November 1, 2023, I electronically filed this Joint

Dispute Statement with the Clerk of Court using the CM/ECF system which will

automatically send email notification of such filing to the following attorneys of

record:

Ryan Buchannan United States Attorney
Melaine A. Williams
Assistant U.S. Attorney
600 Richard B. Russell Bldg.
75 Ted Turner Drive, SW
Atlanta, GA 30303
Melaine.williams@usdoj.gov
***Attorneys for Defendant The United States of America***

Dated this, the 1st day of November, 2023.

*/s/ Matthew E. Cook*
Matthew E. Cook
Kate S. Cook
Nathan R. Nicholson
Joshua L. Bearden