IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

WEBB ANDERSON, as the surviving   :
child of Jesse James Anderson,       :
Deceased; and DONNA ANDERSON,  :
as administrator of the Estate of     :
Jesse James Anderson,              :
                                 :
    Plaintiffs,               :     CIVIL ACTION NO.
                                 :     1:21-cv-03226-AT
    v.                     :
                                 :
UNITED STATES OF AMERICA,     :
                               :
    Defendant.            :

## ORDER

This matter is before the Court on Plaintiffs Webb and Donna Anderson's Motion for Sanctions [Doc. 115]. Plaintiffs' claims here arise from alleged malpractice by Department of Veterans Affairs ("VA") medical providers in the care of Plaintiffs' decedent, Jesse James Anderson, which resulted in an anoxic brain injury to Mr. Anderson and his subsequent death.

The case has proceeded through discovery and is now set for trial starting August 7, 2024. However, close to the end of the discovery period, Plaintiffs began to uncover what they alleged to be serious misconduct by Defendant and its counsel during discovery, leading ultimately to this Motion for Sanctions. As detailed in this Order, in the time since September 2023 when significant discovery issues were first brought to the Court's attention, the Court has per force been engaged in resolving a host of major discovery issues. Ultimately, the Court held a

hearing on Plaintiffs' Motion for Sanctions (Doc. 115) and other related discovery issues on December 14, 2023. (*See* Dec. 14, 2024 Hearing Trans., Doc. 155). The seriousness of Defendant's course of discovery mishandling and concealment prior to January 2024 (when new counsel for the Government took over the helm as lead counsel) ultimately led to Defendant United States filing Supplemental Stipulations of Fact and Admission of Liability on June 10, 2024. (Doc. 200).[1]

The Court appreciates the candor reflected in the United States' recent admission of liability and proposed stipulation of facts as well as its disclosure of documents in 2024 that had previously been withheld or concealed. That said, the Court cannot ignore the lengthy course of concealment and discovery disarray dating back to the three-year period when Plaintiffs' claims remained in the FTCA administrative review process as well as during the discovery period ending in late 2023.

For the reasons set forth in this Order, Plaintiffs' Motion for Sanctions is granted in part and denied in part.

---

[1] This filing occurred within two weeks after the Court asked the parties to brief the question of the Court's authority to enter default judgment as a sanction in connection with discovery misconduct. Defendant's new lead counsel, Andres Sandoval, noted that the process of seeking approval to make such stipulations and admit liability started as early as February 2024, and he had to seek several levels of approval prior to making the stipulations. (Doc. 200 at 4; *see* Docs. 196, 197, 198).

## I.    Background

### A. Underlying Facts[2]

On November 4, 2016, Mr. Anderson, a 70-year-old United States Army Veteran, was admitted to the Atlanta VA Medical Center for an elective right carotid endarterectomy.[3] (Doc. 185 ¶ 1). During his surgery, Mr. Anderson suffered a Cranial Nerve IX injury, which compromised his ability to swallow, and in turn required his use of a feeding tube. (*Id.* ¶ 2). Accordingly, in the days following his surgery, Mr. Anderson obtained his nutrition via a Dobhoff tube, a slender, flexible tube used for patients who need nutrition but are unable to eat normally. (*Id.* ¶ 3, fn. 2). During the early morning hours of November 16, 2016, Mr. Anderson's Dobhoff tube came out on its own or was pulled out by him.[4] (*Id.* ¶ 3).

---

[2] After the hearing on the Motion for Sanctions, the Court ordered the parties to submit proposed statements of facts. (*See* Doc. 150). These facts are mostly taken from those statements and are undisputed unless otherwise noted.

[3] The Court takes notice of the description of carotid endarterectomy surgery provided by the highly respected Mayo Clinic: "Carotid endarterectomy is a procedure to treat carotid artery disease. This disease occurs when fatty, waxy deposits build up in one of the carotid arteries. The carotid arteries are blood vessels located on each side of your neck (carotid arteries). This buildup of plaque (atherosclerosis) may restrict blood flow to your brain. Removing plaque causing the narrowing in the artery can improve blood flow in your carotid artery and reduce your risk of stroke." Mayo Clinic, *Tests & Procedures: Carotid endarterectomy* (December 11, 2018), https://www.mayoclinic.org/tests-procedures/carotid-endarterectomy/about/pac-20393379.

[4] As discussed later, the evidence is not clear regarding what exactly caused the preceding tube to come out or the exact time that occurred, though the first medical record noting the original tube's coming out was entered at 3:50 a.m. on November 16, 2016. (*See* Medical Records excerpt, Doc. 93-22 at 6 (RN note 11/16/16 3:50 a.m. ("Patient's [D]obhoff tube called [sic] out. [N]o distress noted."); RN note 11/16/16 6:31 a.m. ("Vascular surgery md team member made aware that [D]obhoff tube came out")).

At around 8:00 a.m. on the morning of November 16, 2016, Nurse Pamela Brown advised Dr. Jamis Gouge, a medical resident who was on the vascular team rotation and providing care to Mr. Anderson, that Mr. Anderson's Dobhoff tube had come out earlier. (*Id.* ¶ 4). Nurse Brown asked Dr. Gouge what he wanted to do with regard to the Dobhoff tube. (*Id.*). Dr. Gouge responded that Nurse Brown should re-insert a Dobhoff tube into Mr. Anderson. (Doc. 185 ¶ 5). Nurse Brown told Dr. Gouge that "placing Dohhoff [tubes] with mercury"[5] was "out of her scope of practice" and that Dr. Gouge would "have to find someone from his team" to do it. (*Id.*). Dr. Gouge responded to Nurse Brown that he was "very busy" and that he "doesn't have time to do something that a nurse should be able to do." (*Id.* ¶ 6). Over the course of the next several hours, Dr. Gouge argued with the nursing staff, insisting that placing such tubes was in fact within a nurse's scope of practice and that nursing personnel should place the tube as opposed to the vascular team. (*Id.*).

Nurse Brown eventually agreed to insert a Dobhoff tube into Mr. Anderson, although she had no prior experience with such insertions, and went to his room

---

[5] Nurse Brown was not sure whether the tube she was directed to insert and ultimately placed (referred to as "with mercury") or unweighted. From other records, it appears that all Dobhoff tubes at the facility were weighted – but the Court need not conclusively determine whether the tube was weighted or unweighted for the purposes of this Order. (*See* Nurse Brown AIB Statement at 17:6-16 (question by Valencia Johnson, RN: ". . . So you know that Dobhoffs here are all weighted."). In addition, other records appear to indicate that per the policy in effect at that time, the Dobhoff tubes that nurses were able to place were 36 inches in length, as opposed to longer tubes, which could not be placed by a nurse. (*See, e.g.*, Nurse Jenkins AIB Statement at 15:5-15 ("In the policy it states that a nurse is able to insert the 36-inches but not the 46-inches."). It is undisputed that the tube that Nurse Brown used for Mr. Anderson was a 36-inch tube. (*See* Nurse Brown AIB Statement at 18:14-24 ("my colleagues told me that the 36[-inch] one is the one that we can put in . . . [s]o that's the one I took in the room . . . to insert.")).

to do so sometime after 3:00 p.m. on November 16, 2016.[6] (Doc. 185 ¶ 7). Ms. Brown later testified in her statement to the VA Administrative Investigation Board ("AIB") that she had not previously inserted a Dobhoff tube and had not been trained to insert Dobhoff tubes. (*Id.*). During the procedure, the Dobhoff tube was misguided into Mr. Anderson's trachea and through his vocal cords. (*Id.*).

During insertion of the new tube, Mr. Anderson was "coughing and gagging." (*Id.* ¶ 8). Mr. Anderson also exhibited signs of anxiety, and his vital signs showed increased heart rate, elevated systolic pressure, and low oxygen saturation, though the exact timing of these symptoms is disputed. (*Id.* ¶ 9). Dr. Gouge placed an order for Lorazepam (Ativan) at 15:21, and Mr. Anderson was subsequently administered the Ativan. (*Id.*).

After the administration of Ativan, Nurse Brown described that Mr. Anderson "seemed to relax, but at the same time he looked pale." (Doc. 185 ¶ 8). She called Dr. Gouge to "report [Mr. Anderson's] symptoms of elevated [blood pressure] and [heart rate] and decreased oxygen saturation." (*Id.*). A rapid response team ("RRT") was called. (*Id.* ¶ 11). Around the same time RRT members arrived at the room, Mr. Anderson lost consciousness, and a code was called. (*Id.*). The medical providers did not attempt to withdraw the Dobhoff tube while Mr. Anderson was still conscious. (*Id.* ¶ 10).

---

[6] The Court notes that based on the medical notes, by this time, Mr. Anderson had been without a Dobhoff tube inserted for nearly 12 hours. *See* fn. 4, *supra*.

Mr. Anderson was eventually resuscitated by the Code team. (*Id.* ¶ 12). However, the period of oxygen deprivation caused Mr. Anderson to suffer an anoxic brain injury that left him comatose and with a profound neurological injury with no reasonable probability of recovery. (*Id.*). Because of Mr. Anderson's brain injury and the absence of a reasonable probability of recovery, life support was withdrawn and Mr. Anderson died on November 18, 2016. (Doc. 185 ¶ 12).

## B. VA Investigation

Shortly after Mr. Anderson's death, the VA began reviewing Mr. Anderson's care by VA medical providers. As indicated by the Declaration of Sonja Reid, former VA Risk Manager,[7] because the VA viewed the November 16, 2016 incident involving Mr. Anderson as an "adverse event," VA Risk Management first conducted a "preliminary inquiry" into the incident. (Doc. 125-1 ¶ 3). A "preliminary inquiry" is defined as "an informal process to obtain and assemble readily available information about an incident, the results of which may be used for a variety of purposes, including to determine the need for an AIB." (VHA Handbook 0700 dated July 2002, attached to Sonja Reid Decl. ("AIB Handbook"), Doc. 125-1 at 37). The preliminary inquiry included collecting statements from five of the VA nurses involved – Sunja Watson, Deborah Jenkins, Janell McKethan, Robin Thomas, and Pamela Brown ("Provider Statements") – some of which had

---

[7] Ms. Reid served as a Risk Manager for the Atlanta VA Medical Center from 1998 to December 31, 2018. (Doc. 125-1 ¶ 1).

already been written prior to Risk Management's contact with the providers.[8] (Doc. 125-1 ¶¶ 3, 5). Shortly thereafter, the VA engaged in a "non-protected management review" about the incident, resulting in a completed form written by Kelley Wood MSN, RN-BC dated December 2, 2016 (the "Management Review Form").[9] (Doc. 159-5). The Management Review Form concluded that the standard of care was not met.[10]

After reviewing the results of Risk Management's preliminary inquiry, including the Provider Statements, on December 23, 2016, Atlanta VA Medical Center Director Annette Walker convened an inquiry by an Administrative Investigation Board ("AIB"), an internal VA mechanism for factfinding after an "adverse incident," related to Mr. Anderson's care. (Sonja Reid Decl., Doc. 125-1 ¶ 6). At that time, the AIB process was governed by VHA[11] Directive 0700 (dated July 2002)). (*Id.*; *see* AIB Handbook, Doc. 125-1 at 6-79). Several documents were created during the AIB inquiry (the "AIB Documents").[12]

---

[8] The Provider Statements were withheld by Defendant as privileged for most of this case under an assertion of 38 U.S.C. § 5705, a VA "medical quality assurance privilege." (Doc. 102).

[9] As discussed in detail below, Defendant's counsel was allegedly unaware of the existence of the Management Review Form and the AIB Documents (and the existence of the AIB inquiry altogether) until late September 2023. Defendant first identified these documents on a privilege log on December 1, 2023 and withheld the documents under the assertion of work product protection and Georgia peer review privilege under O.C.G.A. § 31-7-133.

[10] The parties have now stipulated to this fact. (*See* Attachment "E" to Draft Am. Consol. Pretrial Order, Doc. 205 at 46, ¶¶ 29-31).

[11] "VHA" stands for Veterans Health Administration, which is a subdivision of the VA.

[12] *See* fn. 9, *supra.*

The AIB was authorized to "thoroughly investigate the adverse events which led to the death of a post-operative patient[;] the allegations of inappropriate [sic] or the lack of nursing staff education and training; the inability to utilize nursing judgement which led to an adverse event; and the allegations of a lack of appropriate physician responsibility and resident supervision." (AIB Final Report Memorandum, Doc. 159-3 at 1). Pursuant to its purpose statement, the AIB was "to evaluate if protocol for dobhoff [sic] insertion is appropriately meeting the standard of care" and to "establish if additional training and education is needed related to nursing and the insertion of dobhoff [sic] feeding tubes." (*Id.* at 1). The AIB report reflects that the AIB obtained testimony from Nurses Pamela Brown, Sunja Watson, and Deborah Jenkins, as well as Dr. Luke Brewster (attending vascular surgeon), and Melvin Person (respiratory therapist). (*Id.* at 2).

The AIB found, in part, that the then-existing protocol for feeding tubes "only briefly identifie[d] who can insert feeding tubes." (*Id.*). It also found,

> Ms. Pamela Brown, the nurse[,] had never inserted a Dobhoff feeding tube. Ms. Brown gave an anti-anxiety medication when the patient was in distress, subsequently the patient died. The vascular resident [Dr. Gouge] harassed the nursing staff to insert the Dobhoff tube, but would not insert the tube himself. The resident physician [Dr. Gouge] intimidated the nursing staff.

(*Id.*). The AIB ultimately concluded that Ms. Brown "should not have inserted the Dobhoff feeding tube as not only was the patient high risk but she had never performed the insertion prior." (*Id.*).

**C. Plaintiffs' VA Administrative Claim and Filing of this Case**

After the November 2016 events at the Atlanta VA and Mr. Jesse Anderson's subsequent death, Mr. Anderson's son and daughter-in-law (as administratrix of Mr. Anderson's estate) filed claims with the Atlanta VA on July 18, 2018, which were received by the Government on July 23, 2018. (Doc. 185 ¶ 14). On June 1, 2021, the Government issued its final denial letter of Plaintiffs' claims. (*Id.* ¶ 16).

On August 9, 2021, Plaintiffs filed this lawsuit, bringing wrongful death and estate claims. (Doc. 1; Doc. 185 ¶ 23). Plaintiffs alleged that the VA caused Mr. Anderson's injuries and death when its medical providers breached the standard of care by misplacing the Dobhoff tube on November 16, 2016; Dr. Gouge's prescribing Ativan and the nurse's administering Ativan at a time when Mr. Anderson was already in respiratory distress; and the failure to engage in timely rescue efforts. (Doc. 185 ¶ 23; *see generally* Compl., Doc. 1).

**D. Discovery Period**

Between February 14, 2022 and August 11, 2023, the parties engaged in fact and expert discovery. (*See* Sched. Ord., Doc. 15; July 12, 2023 Order by Docket Entry Only (extending discovery until August 11, 2023)). A few specific items arising during the discovery period warrant mention, given their relevance to the parties' post-discovery conduct and the Motion for Sanctions.

**1. Defendant's Initial Disclosures and Responses to Plaintiffs' Interrogatories**

On November 12, 2021, Defendant provided its initial disclosures to Plaintiffs, which identified "individuals likely to have discoverable information" as

Plaintiff Webb Anderson, Dr. Gouge, and nurses Robin Thomas, Sunja Watson, and Deborah Jenkins. (Doc. 185 ¶ 29; *see* Doc. 11).

On December 6, 2021, Plaintiffs served interrogatories on the Government requesting identification of "all individuals who were consulted, their employer, when they were consulted, and their response regarding the placement of the Dobhoff tube and Mr. Anderson's subsequent reaction." (Doc. 185 ¶ 31). In response to Plaintiffs' interrogatory asking for identification of all individuals consulted regarding the subject Dobhoff tube placement and Mr. Anderson's subsequent reaction, the Government, in its February 25, 2022 responses, referred Plaintiffs only to "Mr. Jesse James[ Anderson's] Medical note, dated November 16, 2016 authored by Pamela Brown, BSN, RN." (Doc. 185 ¶ 32; Doc. 115-9 at 2). The note to which the Government referred Plaintiffs did not provide the names of any providers, other than Nurse Brown as the author. (Doc. 185 ¶ 33).

Plaintiffs also requested, in their December 6, 2021 interrogatories, information regarding "any review of Jesse James Anderson's case," regardless of whether the review was made "under the peer review process or otherwise," including the participants, purpose, and results of the review and the documents generated by any such review. (*Id.* ¶ 34). In response to Plaintiffs' Interrogatory asking for the identification of any review performed on Mr. Anderson's case, the Government objected on the basis of attorney–client privilege and work product but answered that "any such responsive records are protected from disclosure pursuant to 38 U.S.C. § 5705." (*Id.* ¶ 35).

Despite multiple individuals' names, including Nurse Patani, Denene Lewis, and Linda Parker, being listed in the Provider Statements Defendant and that its counsel possessed and had read, Defendant did not supplement its discovery responses or its initial disclosures with such names. (*Id.* ¶¶ 41, 58). On June 9, 2022, Plaintiffs again requested the contact information for 18 VA employees or former employees. (*Id.* ¶ 42). On June 21, 2022, Defendant provided that information for some, but not all, of the employees. (*Id.*). On the same date, the Government responded to Plaintiffs, stating that it "would first need to know what relevance [Plaintiffs] believe they have to this case since they were not on [the Government's] list of persons with relevant knowledge in [their] disclosures" and that "the only person [the Government would] be adding to that list is Pamela Brown" when expert disclosures were made. (*Id.* ¶ 43).

### 2. Defendant's Initial Privilege Logs

As of May 9, 2022, Defendant agreed to provide Plaintiffs with a privilege log "for any doc[ument]s or info[rmation] being withheld" pursuant to attorney client privilege, work product claims, "and/or statutory privileges/protections (including the date any such doc[ument] was created along with a list of former employees with [such employees'] last known contact info[rmation]." (Doc. 185 ¶ 37). Defendant originally produced a privilege log on May 17 or 18, 2022 (the "May 2022 Privilege Log"), the full substance of which is seen below. (*Id.* ¶ 39).

**DEFENDANT'S PRIVILEGE LOG** — Page 1
May 17, 2022

| Date(s) | Type | Author(s) | Description | Reason Privileged |
|---|---|---|---|---|
| 10/7/21 | Litigation Report with Exhibits | E. Blair | related to 11/16/16 incident | ACP and WP, and 38 U..S.C. 5705 |
| 2/4/20 | Provider Statement | | Related to 11/16/16 incident | ACP and WP, and 38 U.S.C. § 5705 |
| 11/20/16 | Provider Statement | | Related to 11/16/16 incident | ACP and WP, and 38 U.S.C. § 5705 |
| Undated | Provider Statement | | Related to 11/16/16 incident | ACP and WP, and 38 U.S.C. § 5705 |
| Undated | Provider Statement | | related to 11/16/16 incident | ACP and WP, and 38 U.S.C. § 5705 |
| Undated | Provider Statement | | related to 11/16/16 incident | ACP and WP, and 38 U.S.C. § 5705 |
| 8/25/21 to Present | Attorney Emails | E. Blair to US Attorney's Office | Related to 11/16/16 incident & litigation | ACP and WP |

(Doc. 104-5). As is visible above, the May 2022 Privilege Log did not include author names for any of the Provider Statements and did not include dates for some of them. Defendant does not dispute that its counsel had read the Provider Statements of at least Nurse Thomas, Nurse Jenkins, Nurse Brown, and Nurse Watson before they were placed on the May 2022 Privilege Log. (Doc. 185 ¶ 38). Plaintiffs requested the names of the authors of the statements on the May 2022 privilege log, and defense counsel responded with only three of the providers' names but stated that she would look for the provider names and send Plaintiffs an update. (Doc. 185 ¶ 40; *see* Doc. 104-6). Defendant admits that no timely update was sent. (Doc. 185 ¶ 40). Defendant further admits that it did not supplement its discovery responses or initial disclosures with the names of the additional providers that were later known to it. (*Id.* ¶ 41).

After Plaintiffs contended the May 2022 privilege log was inadequate, Defendant provided an updated version on June 15, 2023. (*See* Doc. 104-13).

Plaintiffs also found this version inadequate, although they did not raise the issue immediately to either Defendant or the Court.

Defendant's June 15, 2023 privilege log, for the first time, contained one entry for each of its testifying experts, stating that it was withholding "[c]ommunications with [expert name] not related to compensation or facts/data/assumptions provided by attorneys for the government" as work product. (Doc. 104-13 at 2). Before the deposition of each of the Government's expert witnesses, Plaintiffs served notices of depositions on each expert, requesting all correspondence and notes relating to the case, to which the Government filed neither a motion for protective order nor a motion to quash. (Doc. 185 ¶ 51; *see, e.g.*, Notice of Dep. of Kim A. Klancke, M.D., Doc. 66 at 2, 5 (listing items for the deponent to bring to deposition)). Nonetheless, at the expert depositions and throughout the case, the Government claimed privilege over nearly all email or text communications with expert witnesses. (Doc. 185 ¶ 52).[13]

### 3. Dr. Emily Lagergren's Deposition

On February 1, 2023, during the deposition of Dr. Emily Lagergren (a VA resident at the time of Mr. Anderson's surgery who had treated him prior to the day of his injury), Plaintiffs were informed by Defendant's counsel that a "draft report" prepared by one of the Government's retained experts, Dr. Kim Klancke,

---

[13] It is unknown to the Court whether Defendant produced *any* expert communications to Plaintiffs (including those explicitly not work product under the language of Rule 26) until after Defendant was ordered by the Court to supplement its privilege logs to list all expert communications.

had been shared with Dr. Lagergren by Defendant's counsel during preparation for her testimony. (*Id.* ¶ 53). Despite this disclosure, the Government continued to assert that the draft report was protected from disclosure. (*Id.* ¶ 49; *see also* Def.'s Am. Brief Evidentiary and Legal Basis for Asserted Privileges, Doc. 110 at 2-11).

### 4. Nurse Janell McKethan's Statement and Deposition

Counsel for the Government participated in preparing Nurse McKethan for her February 2023 deposition, along with personal counsel that Ms. McKethan retained. (Doc. 185 ¶ 49). On February 3, 2023, prior to Ms. McKethan's scheduled deposition, Ms. McKethan's personal counsel provided a copy of her written statement regarding Mr. Anderson's care to Government counsel. (Counsel for the Government Melaine Williams Nov. 22, 2023 Decl., Doc. 125-3 ¶ 6). Defendant's counsel states that she "did not open the attachment containing the statement" but asked Ms. McKethan's attorney,

> Did Ms. McKethan provide [the statement] on her own or in response to an internal investigation? If it was written and provided in response to the VA's internal investigation, that information is privileged and should not be disclosed. We can let them know if [sic] its existence at the deposition and put it on a privilege log.

(*Id.*). According to Ms. Williams, Ms. McKethan's counsel "indicated that Ms. McKethan was asked to turn that statement into her nursing manager, and indicated that it was part of a quality assurance review."[14] (*Id.*). Ms. Williams stated that she did not recall receiving the statement, did not read it at the time, and that

---

[14] Ms. Williams's Declaration did not attach the emails between her and Ms. McKethan's personal counsel.

the statement was mistakenly placed into an incorrect folder. (Doc. 185 ¶ 73; Doc. 125-3 ¶ 7). Then, at the deposition on February 10, 2023, Defendant's counsel conveyed that Nurse McKethan had prepared a written statement regarding Mr. Anderson's care, that such statement had been provided to defense counsel, and that the Government would be providing a privilege log listing the statement. (Doc. 185 ¶ 48). She then "inadvertently forgot to add it to the privilege log." (Doc. 125-3 ¶ 7).[15] Meanwhile, Ms. McKethan made statements during her deposition that contradicted the information in her provider statement. (Doc. 185 ¶ 78).

Discovery ended on August 11, 2023. (*See* July 12, 2023 Order by Docket Entry Only (extending discovery until August 11, 2023)).

### E. Post-Discovery Activity

#### 1. September 5, 2023 — Plaintiffs Again Dispute Adequacy of Defendant's Privilege Log and Initiate Discovery Dispute

After the end of discovery, Plaintiffs again raised concerns about the privilege log to Defendants' counsel on September 5, 2023. The parties then held a conference on September 7, 2023, after which Defendant sent an updated version of the privilege log on September 14, 2023.[16] (Doc. 185 ¶ 54; *see* Doc. 104-16). In the meantime, on September 11, 2023, Defendant filed a Motion for Summary

---

[15] Ms. McKethan's statement was listed on the September 25, 2023 privilege log. It was ultimately produced to Plaintiffs together with the other Provider Statements on September 29, 2023, after the Court had ordered the Government to provide properly detailed information and objections regarding withheld documents in its updated privilege log.

[16] As Defendant has noted (and Plaintiffs have admitted), Plaintiffs did first raise this issue to the Court after the close of discovery on August 11, 2023. The Court itself became concerned about the inadequacy of the privilege log once it was presented to the Court.

Judgment on the basis that the standard of care was not breached by VA medical providers. (*See* Doc. 92).

### 2. September 15, 2023 — Plaintiffs File Status Report and Joint Discovery Statement

Three days after the Motion for Summary Judgment was filed, on September 15, 2023, Plaintiffs submitted a Status Report and Joint Discovery Statement to the Court (Doc. 94). The Plaintiffs' Discovery Statement and Status Report suggested that Defendant had withheld various documents, including the Provider Statements, under claims of privilege (including under 38 U.S.C. § 5705, a statutory VA privilege for certain medical quality assurance records) but had not provided an adequate privilege log for Plaintiffs to assess the assertion of privilege. (Doc. 94 at 3-4). Plaintiffs also contended that Defendant's withholding of Dr. Klancke's draft expert report, which had been provided to fact witness Dr. Emily Lagergren before her deposition, was improper. (Doc. 94 at 4).

The Court held a telephone conference with the parties on September 25, 2023. (Doc. 100). During that telephone conference, Plaintiffs also raised an issue regarding several pages of handwritten notes created by Defendant's expert, Dr. Tom Mitros, that he referenced during his deposition but that Defendant withheld from Plaintiffs' counsel as privileged. After the telephone conference, the Court directed the parties to submit additional information and briefing regarding Defendant's assertions of privilege and the timeline of previous meet and confer efforts throughout the discovery period. (*See* Doc. 102). The Court directed Defendant to provide briefing on its legal and evidentiary basis for withholding

these documents (and several others) as privileged, to which Plaintiffs could respond. (Doc. 102 at 2). The Court also directed Defendant to file an updated privilege log containing additional information and submit some of the privilege-logged documents, including the Provider Statements, for *in camera* review. (*Id.*).

Throughout the discovery period, the Government had asserted 38 U.S.C. § 5705 protection over the Provider Statements and several other documents. (Doc. 185 ¶ 44). On September 29, 2023, the deadline by which the Court had directed Defendant to submit the Provider Statements for *in camera* review, Defendant stated that it was "no longer asserting a privilege" over the Provider Statements and provided them to Plaintiffs. (*Id.* ¶ 57; *see also* Doc. 124 at 8 ("[Defendant's counsel] has recently learned that [statements] did not fit within the VA's definition of 38 U.S.C. § 5705, and upon learning this, Defendant has [] removed that reference on the privilege log.")). Defendant's assertion of privilege over the Provider Statements throughout the discovery period in this case is one of the bases of Plaintiffs' Motion for Sanctions (Doc. 115). Notably, the Provider Statements contained names of several witnesses, including Nurse Patani, Denene Lewis, and Linda Parker, whose involvement regarding the discussions of Dobhoff tube placement for Mr. Anderson had not been previously disclosed to Plaintiffs. (Doc. 185 ¶ 58).

The Court held a follow-up telephone conference on October 5, 2023, during which it amended the schedule for the parties' submissions slightly. (Doc. 103). At that telephone conference, Plaintiffs raised their concern that Defendant's

privilege log omitted certain categories of documents, including communications with experts, such that Plaintiffs could not actually assess what factual information might have been provided to the experts. (*Id.*).

The parties then submitted briefing, as directed by the Court, on the issues of whether Defendants' assertions of privilege were warranted and Plaintiffs' good faith efforts to confer during discovery. (*See* Docs. 104, 110, 113, 114). In their response regarding Defendant's asserted privileges, Plaintiffs more fulsomely discussed the issue of Dr. Mitros's withheld handwritten notes. (Doc. 114 at 10-11).

On October 18, 2023, Defendant submitted an updated privilege log, which listed some communications with its experts. (Doc. 111). Plaintiffs raised questions regarding whether some documents in that log were missing (*see* Doc. 114 at 12-13, noting that it appeared the logs mostly showed only "one-way" communications) or being improperly withheld. (*see* Doc. 114 at 12-15). The Court determined in reviewing the October 18, 2023 log that some expert communications did indeed appear to be missing, and on November 1, 2023, the Court directed Defendant via docket entry to again supplement its privilege log:

> Having reviewed the updated privilege logs filed by Defendant on October 18, 2023, it appears to the Court that some communications from counsel (and/or staff working on counsel['s] behalf) to its experts may have been excluded from the logs. On or before November 6, 2023, Defendant is directed to supplement its privilege logs to include all communications from counsel (and staff working on counsels [sic] behalf) to its experts.

(Nov. 1, 2023 Order by Docket Entry Only).

### 3. November 1, 2023 — Plaintiffs File Motion for Sanctions

On the same day, November 1, 2023, Plaintiffs filed both their Motion for Sanctions (Doc. 115) and their Motion to Amend (Doc. 116). Plaintiffs sought sanctions based on both Federal Rule of Civil Procedure 37 and the Court's inherent power. (Doc. 115 at 16-17). Plaintiffs requested that the Court "strike Defendant's answer[,] end its case[,]" and grant default judgment for Plaintiffs. (Doc. 115 at 18).

On November 9, 2023, the Court issued an additional order regarding two of the outstanding expert discovery issues. (Doc. 118). First, the Court ordered Defendant to produce to Plaintiffs the version of Dr. Kim Klancke's draft expert report that had been shown to a fact witness, Dr. Emily Lagergren, during her deposition preparation. (*Id.* at 4-5). The Court found that "[t]he fact that Dr. Lagergren was shown the Draft Report days prior to her deposition testimony raises questions about whether she was influenced by having seen the Draft Report. Fairness requires giving Plaintiffs the opportunity to review the Draft Report and question Dr. Lagergren about it, if they wish." *(Id.).* Second, the Court ordered that several pages of Dr. Mitros's handwritten notes, which he consulted during his deposition and had been withheld as protected material by Defendant, were to be submitted to the Court for *in camera* review. (Doc. 118 at 5-6). Defendant submitted the notes via email on November 14, 2023 for the Court's review.

On November 22, 2023, Defendant responded to Plaintiffs' Motion for Sanctions. (Doc. 124). In support of its response, Defendant filed several exhibits, one of which appeared to be an *ex parte* "subpoena" (hereafter, the "Modified Subpoena Form") that had been served on fact witness Nurse Janell McKethan. (*See* Doc. 125-7).[17]

### 4. November 13, 2023 — Defendant Creates and Issues Modified Subpoena Form

It later became clear that Defendant sent the Modified Subpoena Form to Ms. McKethan (who resides in South Carolina) without providing a copy to Plaintiffs' counsel or filing it with the Court. (Doc. 125-7; Doc. 185 ¶ 78).[18] Ms. Williams had apparently sought out another meeting with Ms. McKethan starting in September 2023 in an attempt to "clarify" differences between Ms. McKethan's deposition testimony and her statement written in November 2016. Ms. McKethan, who was no longer employed with the VA, was not responsive to Ms. Williams' attempts to speak with her. (See Def.'s Am. Resp. to Order to Show Cause, Doc. 138 at 10-11 ("The undersigned continued to reach out to Ms. McKethan via email for two months with her former attorney [copied] who encouraged her to respond, but she still did not respond.")).

---

[17] The Court has attached a copy of this Modified Subpoena Form as an exhibit to this Order, to facilitate the Court's discussion of the issues raised by its use.

[18] The events involving this Modified Subpoena Form are described in detail in the Court's December 5, 2023 Order to Show Cause to Defendant, which the Court incorporates by reference here (Doc. 129 at 2-10).

Then, after Plaintiffs moved for sanctions, Ms. Williams directed a legal assistant, Mr. Orosz, to prepare a subpoena to Ms. McKethan, outside of the discovery period. (Doc. 185 ¶ 84). As Defendant stated in its response to the Court's Order to Show Cause,

> Although Rule 45(c) provides subpoenas for trial, hearings or depositions, the undersigned asked the legal assistant to send a subpoena requesting Ms. McKethan to appear at the U.S. Attorney's Office for a witness interview on November 20, 2023, in anticipation of the December 14, 2023 hearing. Unfortunately, the undersigned counsel interpreted Rule 45(c) too broadly to include witness interviews in association with the hearing, and not just the hearing. Due to time constraints and internal miscommunications and confusion, the subpoena was improperly drafted and served on Ms. McKethan the day when the undersigned was on leave from the office.

(Doc. 138 at 5).

The Defendant's Modified Subpoena Form altered the Court's standard subpoena form, Form AO88B.[19] (*See* Doc. 125-7; Doc. 185 ¶ 82). Form AO88B, in its original form (as seen below), is entitled "SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION."

---

[19] Among the multitude of issues with the Modified Subpoena Form, the Court notes that the version used to create it was not the current version of AO88B (effective February 2014), but a prior version revised in 2009. Where the Court has included screenshots from the blank original form, those are from the currently effective version of AO88B. *See* fn. 2, *infra*.

(Form AO88B[20] (highlight added)).

The Modified Subpoena Form prepared at Ms. Williams' direction, meanwhile, (*see* Doc. 125-7) had its title edited to read "SUBPOENA TO APPEAR FOR QUESTIONING BY THE UNITED STATES ATTORNEY'S OFFICE."



---

[20] This currently effective form is available for download at the United States Courts website at https://www.uscourts.gov/forms/notice-lawsuit-summons-subpoena/subpoena-produce-documents-information-or-objects-or-permit.

(Doc. 125-7 at 1 (highlight added)).[21]

In addition, in accordance with Federal Rule of Civil Procedure 45, which governs subpoenas, the original form provides fillable sections for "Production" and/or "Inspection of Premises":

| ❏ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material: |
|---|

| Place: | Date and Time: |
|---|---|
| | |

| ❏ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it. |
|---|

| Place: | Date and Time: |
|---|---|
| | |

(Form AO88B (highlight added)). The Modified Subpoena Form edited the "Production" section, instead attempting to command Ms. McKethan to appear to discuss the case at the U.S. Attorney's office in Atlanta on Monday, November 20, 2023.

---

[21] The filed version included what appears to be Ms. McKethan's full home address, which the Court has redacted in accordance with this Court's Standing Order No. 04-02 (providing that filed documents should redact home addresses, except the city and state). The Court has left the ZIP code visible here because the Court used it in calculating the approximate distance between Ms. McKethan's residence and the United States Attorney's Office in Atlanta (discussed *infra*).

☑ *Appearance:* **YOU ARE COMMANDED** to appear at the time, date, and place set forth below to discuss the above-referenced case.

> ☑ *Appearance:* **YOU ARE COMMANDED** to appear at the time, date, and place set forth below to discuss the above-referenced case.
>
> Your presence is needed to as an evidentary hearing in this case is scheduled for December 14th, 2023 and statments you have provided in th case will be argued at the hearing.
>
> | Place: United States Attorney's Office<br>75 Ted Turner Dr., S.W., Suite 600<br>Atlanta, Georgia 30303 | Date and Time:<br><br>11/20/2023 12:25 pm |
> |---|---|
>
> ☐ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.
>
> | Place: | Date and Time: |
> |---|---|

(Doc. 125-7 at 1 (highlight added); Doc. 185 ¶ 79). In full, the edited section read, "*Appearance*: **YOU ARE COMMANDED** to appear at the time, date, and place set forth below to discuss the above-referenced case." Then, in the blank section, it reads, "Your presence is needed to as an evidentary [sic] hearing in this case is scheduled for December 14th, 2023 and statements [sic] you have provided in th [sic] case will be argued at the hearing." (Doc. 125-7 at 1; Doc. 185 ¶ 79).

Per Defendant's Response to the Court's Order to Show Cause, Ms. Williams was out of the office on the day the Modified Subpoena Form was prepared and sent to the process server. (Doc. 138 at 3). The Modified Subpoena Form was instead signed by Defendant's counsel Sharon Lim, who testified that she was asked to sign the Form by Ms. Williams.[22] (Sharon Lim Decl., Doc. 168-1 ¶¶ 16, 20). Mr. Orosz, their legal assistant, sent the (apparently completed) Modified

---

[22] Ms. Lim first appeared in the case on June 9, 2023, and had no involvement in fact discovery. (Sharon Lim Decl., Doc. 168-1 ¶¶ 5-6).

Subpoena Form to Ms. Lim via email, requesting her signature. (Sharon Lim Decl., Doc. 168-1 ¶¶ 17, 20). Ms. Lim "did not review the contents of the subpoena before electronically signing it" and returning it via email to Mr. Orosz. (Doc. 185 ¶ 83, 91; Sharon Lim Decl., Doc. 168-1 ¶¶ 20-21).[23]

Ms. Lim states that when she signed the Form, she "did not notice that the standard subpoena form had been modified in any way," and "assumed that the subpoena had been reviewed by [Ms.] Williams and was in final form when it was sent to [Ms. Lim]." (Sharon Lim Decl., Doc. 168-1 ¶¶ 21-22).

The Modified Subpoena Form was sent to a process server on November 13, 2023 and then served on Ms. McKethan at her home in Edgefield, South Carolina (more than 100 miles from the U.S. Attorney's Office in Atlanta) on Friday, November 17, 2023.[24] (Doc. 138 at 3). Only upon receipt of this subpoena demanding Ms. McKethan's appearance to give testimony before the U.S. Attorney's office in Atlanta did Ms. McKethan call Defendant's counsel to inform Defendant's counsel that she was making arrangements to come to the U.S. Attorney's office in Atlanta. (Doc. 138 at 3). Defendant's counsel then told her that she did not have to come to the office and a video call would suffice. (Doc. 138 at 3). As noted above, at the time the Government issued the Modified Subpoena

---

[23] At the December 14, 2023 hearing, Ms. Lim also represented that she electronically signed the McKethan subpoena without reviewing it or following up on it. (Doc. 185 ¶ 91; December 14, 2023 Hearing Trans., Doc. 155 at 69:14–23).

[24] Notably, Friday, November 17th was the business day prior to the date that the Form "commanded" Ms. McKethan to appear at the U.S. Attorney's Office in Atlanta (Monday, November 20th).

Form, Ms. McKethan lived over 100 miles away and was not subject to the subpoena power of this Court except by consent. (Doc. 185 ¶ 81).

On November 20, 2023, Ms. McKethan and her personal counsel attended a video call with Ms. Williams, Ms. Lim, and Mr. Orosz. (Doc. 138 at 4). Ms. Williams apparently asked Ms. McKethan how her statement reconciled with her deposition testimony and she "started to point out the differences between her statement and her deposition testimony." (Doc. 138 at 4). According to Ms. Williams, Ms. McKethan

> started pointing out so many changes that the undersigned suggested, that instead of going through each change on the Webex call, Ms. McKethan could use the errata form to identify the differences, but not to change her testimony since she could no longer do that. The undersigned also left it up to Ms. McKethan and her attorney to decide what to do but we never suggested that the errata sheet be used to change her testimony.

(Doc. 138 at 4). Ms. Williams also testified, "The failure to serve Plaintiffs' counsel with a copy of the McKethan subpoena was an inadvertent oversight. I did not try to conceal any facts or theories but wanted to get to the bottom of it in order to present the Court with all the facts." (M. Williams Feb. 1, 2024 Decl., Doc. 177-1 ¶ 21).

In response to the Modified Subpoena Form and after discussions with counsel for the Government, Ms. McKethan, through her personal counsel, provided a Declaration ("McKethan Declaration"), making more than 25 changes to her deposition via an errata sheet "clarifying her testimony" and other changes to her deposition over nine months after its completion. (Doc. 185 ¶ 80; Doc. 125-

26

8). All of this occurred after Government counsel's extraordinary and unauthorized exercise of the subpoena power for the purpose identified and without notice to opposing counsel. Defendant filed the McKethan Declaration in support of its Response to the Motion for Sanctions. (*See* Doc. 125-8).

Plaintiffs flagged the issues with the Modified Subpoena Form in their Reply in Support of their Motion for Sanctions (Doc. 126). Shortly thereafter, based on the alterations to the Court's subpoena form, the failure to copy Plaintiffs' counsel, and the service of a purported subpoena beyond the territorial limits of the Court's compulsory power, the Court ordered the Government to show cause no later than December 11, 2023, regarding how and why the Modified Subpoena Form was sent and why Defendant should not be sanctioned and the McKethan Declaration stricken. (Doc. 185 ¶ 85; *see* Dec. 5, 2023 Order to Show Cause, Doc. 129). In response to the Court's Order, the Government filed a Response on December 11, 2023, and entered the document into the Court's CM/ECF filing system at midnight on December 12, 2023. (Doc. 185 ¶ 86; *see* Doc. 137). The next day, the Government filed an "Amended" response to the Court's Order to show cause, beyond the deadline set by the Court.[25] (Doc. 185 ¶ 87; *see* Doc. 138).

---

[25] Plaintiffs point out that the "amended" response removed Defendant's "offer to pay for briefing and depositions." (Doc. 185 ¶ 87).

### 5. December 1, 2023 — Defendant Submits Updated Privilege Log Listing AIB and Other Review Documents

As of December 1, 2023, both of Plaintiffs' Motions were fully briefed and had been set for a hearing on December 14, 2023. But that, unfortunately, does not end the saga. Later on December 1, 2023, Defendant filed another updated privilege log. (Doc. 127). This newest version of Defendant's privilege log included documents from internal VA reviews from 2016 to 2018, including the AIB inquiry, that had never before been identified to the Court or Plaintiffs' counsel.

According to Defendant's counsel, Ms. Williams, she had been unaware of these early reviews and the documents stemming therefrom until September 27, 2023, when she learned of them from VA Risk Management employee Sam Strother. (M. Williams Dec. 7, 2023 Decl., Doc. 135-1 ¶¶ 11, 12). Ms. Elizabeth Blair, a staff attorney with the VA Office of General Counsel's tort law group (and the internal VA counsel who was assigned to this case shortly after the filing of Plaintiffs' VA Administrative Claim), did not report the existence of an AIB in the privileged litigation report she created and sent to the USAO on October 7, 2021. (Elizabeth Blair Jan. 30, 2023 Decl., Doc. 171-1 ¶ 25). Ms. Blair acknowledges that she received an email on October 1, 2018 containing the AIB Final Report, but states that she "unintentionally, inadvertently" missed this email and therefore "erred telling the USAO that there was no AIB" in Mr. Anderson's case. (Blair Decl., Doc. 171-1 ¶ 26).

Ms. Williams represented to the Court in her December 2023 declaration and remarks in Court that she learned of the AIB inquiry only when she inquired

with Risk Management after the parties' initial, September 25, 2023 telephone
conference with the Court. (*See* M. Williams Dec. 7, 2023 Decl., 135-1 ¶ 12 ("On
September 27, 2023, I was alerted to the existence of an AIB, and the fact that the
AIB was a separate investigation from the FTCA investigation.")). "Risk
Management subsequently located unsigned copies of the AIB documents in its
electronic files and sent the AIB [Documents] . . . on December 1, 2023, which
[Defendant] included on the privilege log out of an abundance of caution on
December 1, 2023."[26] (M. Williams Decl., 135-1 ¶ 12; *see also* Doc. 127). Shortly
thereafter, Risk Management was able to locate the final AIB report, which
Defendant listed on its subsequent, December 7, 2023, privilege log. (M. Williams
Dec. 13, 2023 Decl., Doc. 142-1 ¶ 11). Ms. Williams further declared that VA Risk
Management had, so far, been unable to locate the evidence and exhibits that were
attached to the final AIB report. (M. Williams Dec. 13, 2023 Decl., Doc. 142-1 ¶ 11).

In Defendant's December 1, 2023 privilege log, the first in which these
withheld documents were listed, the log stated that the Management Review Form
and the AIB Documents were being withheld as protected work product.
Defendant also contended that these documents were subject to Georgia's medical
peer review privilege under O.C.G.A. § 31-7-133. (*See* Doc. 127-1; Doc. 185 ¶ 45).
Defendant submitted another privilege log on December 7, 2023 listing more

---

[26] The AIB Documents also included a non-privileged AIB Union Notice, which Defendant
produced to Plaintiffs during the hearing on December 14, 2023 at the Court's direction.
(M. Williams Dec. 7, 2023 Decl., Doc. 135-1 ¶ 12).

previously-undisclosed documents. (Doc. 133-1). In advance of the hearing, the Court ordered that the AIB Documents[27] and the Management Review Form be submitted to the Court for *in camera* review on December 12, 2023. (Dec. 11, 2023 Order by Docket Entry Only).

Shortly before the scheduled hearing, the Court issued an order listing various topics and questions that the parties should be prepared to address during the hearing. (*See* Dec. 12, 2023 Order, Doc. 139). The Court further notified

> Defendant and its counsel that Melaine Williams and Sharon Lim may need to testify and be subject to cross-examination at the hearing. In addition, the legal assistant who sent the modified subpoena form to Ms. McKethan (*see* Doc. 138 at 5) should be available in case the Court has additional questions that counsel is unable to answer.

(Doc. 139 at 2).

### F. December 14, 2023 — Hearing on Motions

During the December 14, 2023 hearing, the Court discussed the issues raised in the Motion for Sanctions, Motion to Amend, and related pleadings with the parties.

At the beginning of the December 14, 2023 hearing, Plaintiffs' counsel invoked the rule of sequestration "if there are any witnesses that [] may be testifying." (Doc. 185 ¶ 92; Doc. 155 at 6). After some discussion, the Court asked, "no one else [seated] in the back will be testifying; is that right?" (Doc. 155 at 7). Ms. Williams confirmed that was correct. (Doc. 155 at 7). Notably, Mr. Orosz, a

---

[27] Listed at entries # 3-7 on Defendant's December 7, 2023 privilege log. (See Doc. 133-1 at 2-3).

legal assistant with the U.S. Attorney's Office who had apparently drafted the Modified Subpoena Form, remained seated in the gallery throughout the hearing. Much later in the hearing, Plaintiffs' counsel informed the Court that Mr. Orosz had been seated in the courtroom throughout the hearing. (Doc. 155 at 80). The Court then told Ms. Williams,

> I didn't realize that that was your legal assistant [in the courtroom] or else I would have excused him so [] I wouldn't ask him a question that had already been discussed here. That sort of defeats the purpose.
> . . .
> [A]t this juncture, since [Mr. Orosz] sat through all of your testimony, I think that puts him in a very difficult position. So the whole point of sequestering somebody who might testify is to have him sequestered, not to leave him in the courtroom to hear any testimony or statements. [] I did not realize that was your legal assistant, or else I would have asked you to have kept him outside the courtroom.

(Doc. 155 at 81-82).

In addition, the Court discussed Defendant's claims of privilege over the AIB Documents and the Management Review Form with the parties in the December 14, 2023 hearing.[28] During the hearing, Defendant agreed to withdraw its claims of work product protection over the AIB Documents, but continued to assert Georgia peer review privilege.

The Court orally denied Defendant's Motion for Summary Judgment during the hearing.

---

[28] Plaintiffs raised some objections to other documents on the Defendant's privilege log at the hearing that had not been previously raised to the Court. Those objections were resolved in the Court's May 15, 2024 Order on *in camera* review. (Doc. 139).

### G. Post-Hearing Developments

Several days after the hearing, on December 20, 2023, Defendant informed the Court that it was withdrawing its claim of Georgia peer review privilege under O.C.G.A. § 31-7-133 for all of the AIB Documents and had produced them to Plaintiffs. However, Defendant continued to assert Georgia peer review privilege over the November 30, 2016 Management Review Form (listed at #2 on Defendant's Dec. 7, 2023 privilege log):

| | Date(s) of Creation | Type of Document | Author(s) Name/Position | Recipient Name/Position & Any Copy Recipients | Document Custodian | File Name | Subject Matter /Topic | Type of Privilege |
|---|---|---|---|---|---|---|---|---|
| 2 | November 30, 2016 | Form | VA Provider (identity is kept confidential to preserve the integrity of the review) | VA Risk Management ("Mgmt"), Chief of Nurse Manager, VA Office of General Counsel ("VA OGC") | VA Risk Mgmt | Peer Review | Review of Nursing Care rendered for Jesse Anderson | O.C.G.A § 31-7-133 |

(Doc. 133-1 at 1). On January 10, 2024, however, Defendant's counsel reversed course and notified the Court via email that it was no longer asserting a privilege over the Management Review Form and produced it to Plaintiffs.

On January 3, 2024, Plaintiffs filed a list of all documents over which they contested Defendant's assertion of privilege. (Doc. 157). On January 5, 2024, the Court ordered, "Defendant is directed to submit all documents challenged by Plaintiffs in their submission at Doc. 157 (except Docs. 1 and 2 on Defendants Dec. 23, 2023 privilege log, which were previously submitted to the Court) to the Court for in camera review[.]" (Jan. 5, 2024 Order by Docket Entry Only).

On January 12, 2024, Defendant's counsel, Andres Sandoval, notified the Court via email that the government had identified yet more communications with

its experts that had not been previously privilege-logged. He requested a teleconference with the Court, which was held on January 19, 2024. (*See* Doc. 161). During that conference, Mr. Sandoval indicated that the government needed more time to ensure that it had gathered all communications between Defendant's counsel and its staff and its experts (and the experts' staff, where applicable).[29] The Court granted an extension of time for Defendant's final production of documents and an updated privilege log until February 9, 2024. Defendant submitted its final privilege log to the Court on February 9, 2024. (Doc. 183). Defendant submitted all expert communications remaining on its privilege log (a total of 130 documents) to the Court for *in camera* review as ordered by the Court. On or about February 12, 2024,[30] Defendant produced a total of 897 expert communications to Plaintiffs. On May 15, 2024, the Court issued an order stating the findings of its *in camera* review. (Doc. 193). The Court ordered Defendant to produce some or all of four of the withheld documents to Plaintiffs, but agreed that the remainder were properly withheld as work product. (Doc. 193).

---

[29] Ms. Williams filed a Certificate of Consent for Withdrawal of Counsel on February 6, 2024. (Doc. 179-1). Mr. Sandoval along with Ms. Lim formally took over the role as Government counsel in this case at that juncture. Mr. Sandoval appears to have for practical purposes taken over the role as lead counsel in January 2024.

[30] Defendant's counsel Andres Sandoval attempted to share the files on February 9, 2024, but it appears from the parties' email communications to the Court that the files were not actually available to Plaintiffs until on or after February 12, 2024 due to apparent technical issues.

## II.  Legal Standard

### A. Obligation of Disclosure in Discovery

Under Federal Rule of Civil Procedure 26(e),

> A party who has made a disclosure under Rule 26(a)—or who has responded to an interrogatory, request for production, or request for admission—**must supplement or correct its disclosure or response**:
>
> . . . in a timely manner **if the party learns that in some material respect the disclosure or response is incomplete or incorrect**, and **if the additional or corrective information has not otherwise been made known** to the other parties during the discovery process or in writing[.]

(emphasis added). The Rule continues,

> Every disclosure under Rule 26(a)(1) or (a)(3) and every discovery request, response, or objection must be signed by at least one attorney of record in the attorney's own name—or by the party personally, if unrepresented—and must state the signer's address, e-mail address, and telephone number. By signing, an attorney or party certifies that **to the best of the person's knowledge, information, and belief formed after a reasonable inquiry:**
>
> **(A) with respect to a disclosure, it is complete and correct as of the time it is made[.]**
>
> . . .
>
> **If a certification violates this rule without substantial justification, the court, on motion or on its own, must impose an appropriate sanction on the signer, the party on whose behalf the signer was acting, or both**. The sanction may include an order to pay the reasonable expenses, including attorney's fees, caused by the violation.

Fed. R. Civ. P. 26(g) (emphasis added).

34

"Under Rule 26(g)(1)(A), a party or an attorney signing a discovery response 'certifies that to the best of the person's knowledge, information, and belief formed after a reasonable inquiry' that the responses are complete and correct. *Waddell v. HW3 Inv. Grp., LLC*, 2021 WL 9781801, at *2 (N.D. Fla. Dec. 23, 2021) (quoting Fed. R. Civ. P. 26(g)(1)(A)). "[T]hese Rules place a burden on a party and the party's counsel 'to ensure that a reasonable and complete search is conducted and that all responsive material is either produced or withheld under a proper objection.'" *Id.* (quoting *Kellgren v. Petco Animal Supplies, Inc.*, 2016 WL 4097521, at *3 (S.D. Cal. May 26, 2016)); *see also In re Delta/AirTran Baggage Fee Antitrust Litig.*, 846 F. Supp. 2d 1335, 1350 (N.D. Ga. 2012), *modified sub nom. In re Delta/Airtran Baggage Fee Antitrust Litig.*, 2012 WL 12952328 (N.D. Ga. July 18, 2012).

### B. Claiming Privilege or Other Protection Over Discoverable Information

Federal Rule of Civil Procedure 26(b)(5) states a party's obligations with regard to withholding information as privileged or otherwise protected from disclosure:

(A) *Information Withheld.* When a party withholds information otherwise discoverable by claiming that the information is privileged or subject to protection as trial-preparation material, the party must:

(i) expressly make the claim; and

(ii) describe the nature of the documents, communications, or tangible things not produced or disclosed--and do so in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the claim.

When this provision was originally adopted, the Advisory Committee noted, in relevant part,

> A party must notify other parties if it is withholding materials otherwise subject to disclosure under the rule or pursuant to a discovery request because it is asserting a claim of privilege or work product protection. **To withhold materials without such notice is contrary to the rule, subjects the party to sanctions under Rule 37(b)(2), and may be viewed as a waiver of the privilege or protection.**
>
> The party must also provide sufficient information to enable other parties to evaluate the applicability of the claimed privilege or protection. Although the person from whom the discovery is sought decides whether to claim a privilege or protection, the court ultimately decides whether, if this claim is challenged, the privilege or protection applies. Providing information pertinent to the applicability of the privilege or protection should reduce the need for in camera examination of the documents.
>
> The rule does not attempt to define for each case what information must be provided when a party asserts a claim of privilege or work product protection.

1993 advisory committee note to Fed. R. Civ. P. 26 (emphasis added).

### C. Consequences for Failure to Provide Discoverable Information and Litigation Misconduct

Federal Rule of Civil Procedure 37 provides that "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information . . . at trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). In other words, "Rule 37 allows the district court to exclude [evidence] as a sanction for a Rule 26 violation." *Mitchell v. Ford Motor Co.*, 318 F. App'x 821, 824 (11th Cir. 2009). "The burden of

establishing that a failure to disclose was substantially justified or harmless rests on the non-disclosing party." *Id.*

In addition to or instead of excluding evidence at trial, the Court may order a variety of other sanctions for Rule 26 violations. Fed. R. Civ. P. 37(c)(1)(A)-(C). Permissible sanctions include ordering payment of reasonable expenses and attorney's fees, informing the jury of the party's failure to produce documents, directing that certain facts be taken as established, prohibiting the non-disclosing party from supporting or opposing certain claims or defenses, striking pleadings, or rendering default judgment. *Id.*; Fed. R. Civ. P. 37(b)(2)(A)(i)-(vi). District courts have broad discretion to impose sanctions under Rule 37. *Dorey v. Dorey*, 609 F.2d 1128, 1135 (5th Cir. 1980).[31] The Court is therefore allowed a "range of choice . . . so long as that choice does not constitute a clear error of judgment." *Fuentes v. Classica Cruise Operator Ltd.*, 32 F.4th 1311, 1321 (11th Cir. 2022) (quoting *United States v. Frazier*, 387 F.3d 1244, 1259 (11th Cir. 2004) (en banc)).

In addition, as this Court stated in its sanctions order in *Githieya v. Glob. Tel\*Link Corp.*, the Court may, in appropriate circumstances, issue sanctions pursuant to its inherent powers:

> A court may "impose sanctions for litigation misconduct under its inherent power." *Eagle Hospital Physicians v. SRG Consulting, Inc.*, 561 F.3d 1298, 1306 (11th Cir. 2009). This power "derives from the court's need to manage its own affairs so as to achieve the orderly . . . disposition" of a case, but must be "exercised with restraint and

---

[31] In *Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981), the Eleventh Circuit adopted as precedent the decisions of the former Fifth Circuit.

discretion." *Id.* (internal punctuation and citations omitted). "The key to unlocking a court's inherent power is [also] a finding of bad faith." *Id.* (quotation marks and citation omitted). "A finding of bad faith is warranted where an attorney knowingly or recklessly raises a frivolous argument, or argues a meritorious claim for the purpose of harassing an opponent. A party also demonstrates bad faith by delaying or disrupting the litigation or hampering enforcement of a court order." *Barnes v. Dalton*, 158 F.3d 1212, 1214 (11th Cir. 1998). Two common fact patterns reappear in cases involving findings of bad faith: willful misconduct that corrupts the adversary process or repeated failures to obey the court's discovery orders.

The Eleventh Circuit has held that "the inherent-powers standard is a subjective bad-faith standard." *Purchasing Power, LLC v. Bluestem Brands, Inc.*, 851 F.3d 1218, 1223 (2017) (citing *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 382, (2013) and *Chambers v. NASCO, Inc.*, 501 U.S. 32, 45–46 (1991)). Under this standard, "a court has [the] inherent power to . . . sanction the willful disobedience of a court order, and to sanction a party who has acted in bad faith, vexatiously, wantonly, or for oppressive reasons." *Marx*, 568 U.S. at 382 (citing *Chambers*, 501 U.S. at 45–46). "The inherent power must be exercised with restraint and discretion. This power is not a remedy for protracted litigation; it is for rectifying disobedience . . . " *Purchasing Power*, 851 F.3d at 1225 (citing *Chambers*, 501 U.S. at 45–46). **"[I]n the absence of direct evidence of subjective bad faith, this standard can be met if an attorney's conduct is so egregious that it could only be committed in bad faith."** *Id.* (citing *Roadway Exp., Inc. v. Piper*, 447 U.S. 752, 767 (1980)). The Eleventh Circuit is clear that "[t]his is not the same as simple recklessness, which can be a starting point but requires something more to constitute bad faith." *Purchasing Power*, 851 F.3d at 1225. Thus, "[r]ecklessness alone does not satisfy the inherent powers standard; there must be more." *Id.* **"Bad faith exists when the court finds that a fraud has been practiced upon it, or 'that the very temple of justice has been defiled,' . . . or where a party or attorney knowingly or recklessly raises a frivolous argument, delays or disrupts the litigation, or hampers the enforcement of a court order."** *Allapattah Servs., Inc. v. Exxon Corp.*, 372 F. Supp. 2d 1344, 1373 (S.D. Fla. 2005) (citing *Chambers*, 501 U.S. at 46; *Malautea v. Suzuki Motor Co. Ltd.*, 987 F.2d 1536, 1545–46 (11th Cir. 1993))

. . .

For example, in *In re Sunshine Jr. Stores, Inc.*, the Eleventh Circuit upheld a bankruptcy court's use of its inherent power to enter a default against Bank of New York over objection that it was not properly notified of consequences of its actions. 456 F.3d 1291, 1304 (11th Cir. 2006). Bank of New York had failed to comply with multiple court orders over the span of eighteen months in an attempt to block discovery into whether or not it complied with its fiduciary obligations to provide an accounting of debtor's funds and pay interest on those funds. The Eleventh Circuit affirmed the district court's finding of bad faith because the Bank's "noncompliance delayed the resolution of the Debtor's bankruptcy case, interfered with the bankruptcy court's ability to manage its case load, and, most obviously, hampered the enforcement of the court's orders." *Id.* at 1305. The Court explained that the Bank's "conduct forced the Debtor repeatedly to appear before the court, seek relief from the court, and otherwise litigate matters that should have been resolved far more quickly." *Id.*

"Because of their very potency, inherent powers must be exercised with restraint and discretion." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44 (1991). "A primary aspect of that discretion is the ability to fashion an appropriate sanction for conduct which abuses the judicial process." *Id.* at 44–45; *see also Malautea v. Suzuki Motor Co.*, 987 F.2d 1536, 1545 (11th Cir. 1993) (court's inherent authority "includes the authority to impose reasonable and appropriate sanctions"). The Eleventh Circuit has instructed that "[t]he severe sanction of a dismissal or default judgment is appropriate only as a last resort, when less drastic sanctions would not ensure compliance with the court's orders." *In re Sunshine Jr. Stores, Inc.*, 456 F.3d 1291, 1305 (11th Cir. 2006).

608 F. Supp. 3d 1290, 1296–98 (N.D. Ga. 2020) (emphasis added).

## III.   Discussion

The conduct giving rise to this Motion for Sanctions involves the Government's failure to fully investigate and timely disclose certain vital documents and witness-related communications on a timely basis to Plaintiffs ***prior to the close of discovery*** or to timely produce and complete proper privilege logs. The misconduct at issue also encompasses the Government's

potential improper effort to influence fact witnesses. This effort included, but was not limited to, the procedurally improper and coercive "subpoena" directed to Ms. McKethan. While the Court at this point believes and surely hopes that virtually all of the non-privileged documents Plaintiffs were entitled to receive from Defendant have now been produced,[32] it cannot be absolutely certain of this fact, given the course of events over the last year — including the highly belated post-discovery production of the AIB investigation in January 2024, subsequent to the Court's discovery hearing on December 14, 2023. The Court notes that Defendant acknowledged that the AIB investigative documents were not fully complete and that additionally, the post-discovery-period, belated production of the AIB investigation itself was missing some constituent documents that somehow had been misplaced. (*See* Dec. 14, 2024 Hearing Trans., Doc. 155 at 39-40, discussing Defendant's counsel and VA staff's acknowledgment of some missing AIB documents).

The process of obtaining the withheld information and documents required Plaintiffs' persistence and the Court's intervention at every turn. While discovery

---

[32] In its May 15, 2024 Order, the Court ordered Defendant to produce some or all of four previously withheld documents within 7 days. (Doc. 193). On May 22, 2024, Defendant indicated it had complied. (Doc. 194). Thereafter, Mr. Sandoval on behalf of the Government conducted another document search and identified additional documents that were produced in the months to come. Based on the identification of yet more responsive documents, Plaintiffs moved for leave to file an updated brief on appropriate sanctions. (Doc. 212). Defendant's final substantive batch of 104 documents (totaling 762 pages) was produced during the week of July 29, 2024. On August 4, 2024, the Court understands that Defendant produced a few more documents. The trial in this matter is set to commence on August 7, 2024.

production materially improved after Mr. Sandoval took primary responsibility for document production after the close of discovery, production of relevant VA documents proceeded on a dribbling basis all the way until the week of trial. The Government failed both in the three-year pre-suit claim review period and the original, nearly 18-month-long discovery period to identify or produce initial and AIB investigative documents and key staff statements related to the events in this case. The Government repeatedly threw assertions of privilege and protection as obstacles in Plaintiffs' path throughout the discovery period, without, apparently, a full understanding of whether those assertions were truly justified. It was only after the close of discovery in August 2023, and after the Court in September delved into review of the Government's far-reaching, undetailed privilege assertions, that the Government began to withdraw its privilege assertions and produce the documents at issue on a trickling basis.[33] The Government amended its privilege log no less than nine times between September 25, 2023 (the date of the Court's first phone conference with the parties on these issues) and February 9, 2024. (*See, e.g.*, Docs. 111, 119, 127, 133, 140, 151, 184). And then, as discussed above, additional documents were found and produced in the months directly leading up to the trial. Defendant's conduct required both Plaintiffs and the Court

---

[33] This pattern of behavior distinguishes this case from others in this district such as *Williams v. Taser Int'l, Inc.* and *Meade v. Gen. Motors, LLC*, in which the reviewing court could remedy the harm on a timely basis during the discovery period by simply ordering that any assertion of privilege was waived as to documents that were not properly privilege-logged. 274 F.R.D. 694, 698 (N.D. Ga. 2008); 250 F. Supp. 3d 1387, 1396 (N.D. Ga. 2017). Defendant's continual belated post-discovery productions have created thornier issues for the Court to deal with.

to expend significant time and resources piecing together the Government's actual evidence and conduct as well as attempting to assess the merit of related legal contentions when limited reliable information had been furnished.

Plaintiffs contend that Defendant acted in bad faith by claiming privilege or work product protection over documents and information "to obstruct Plaintiffs' access to relevant documents, witnesses, and evidence[.]" (Doc. 115 at 6). Defendant responds that it did not act in bad faith, but acknowledges that it made some "mistakes" in the course of the case. (Dec. 14, 2023 Hearing Trans., Doc. 155 at 198). But, as Plaintiffs' counsel memorably stated during the December 14, 2023 Hearing, "there's a lot of whoopsies in the case," according to Defendant, "[b]ut just coincidentally, they all add up in [Defendant's] favor and are all to the detriment of" Plaintiffs. (Dec. 14, 2023 Hearing Trans., Doc. 155 at 78:12-16). Unfortunately, as it turned out, the Government's litigation approach at least until January 2024 entailed a pattern of serious non-disclosures and other misconduct that far exceeded mere "whoopsies." And this course of conduct also meant that the Government had fallen into a hole in its production of documents, witnesses, and information that would not be easy to dig out of.

## A. Specific Issues

The issues with Defendant's conduct that have now been raised by Plaintiffs and/or the Court are:

1. Defendant's incomplete discovery answers/alleged concealment of witnesses;

2. Defendant's inadequate privilege logs;

3.  Defendant's withholding of Provider Statements;

4.  Defendant's withholding of the AIB Statements and other review documents;

5.  Defendant's legally improper handling of the subpoena of Janell McKethan; its legally unauthorized modification of the subpoena form and mandate for an interview or hearing; its failure to provide notice to Plaintiffs' counsel; and the coercive dimension of this course of conduct.

## 1. Incomplete Discovery Answers/Alleged Concealment of Witnesses

Plaintiffs contend that Defendant failed to provide the names of several witnesses, including providers who were involved in the decision-making with regard to Mr. Anderson's care on November 16, 2016. (*See* Doc. 115 at 12-16). In Plaintiffs' view, these names should have been provided either in Defendant's initial disclosures or its discovery responses. (*Id.*). Instead, Plaintiffs have only obtained these providers' names from the belated post-discovery-produced Provider Statements. (*Id.*).

Ms. Williams' Declaration regarding Defendant's allegedly incomplete discovery responses and failure to provide the names of certain witnesses asserts that:

> Defendant did not have an obligation to list Ms. Patani, Ms. Lewis or Ms. Parker in its initial disclosures because it did not intend to use their testimony to support its claims or defense,[] they were responsive to Plaintiffs' Interrogatory No. 3 [sic]; Moreover, [sic] at the time I drafted Defendant's responses to the interrogatory, I had not yet received Pamela Brown or Deborah Jenkins' statements with their names, and therefore, was not aware of them to include them in my response. I am also aware that Plaintiffs argued that the government has refused to disclose Nurse Patani's name in the motion for sanctions. [] I was not familiar with this person and missed reading

her name in Pam Brown's ROC Provider Statement that had been filed
away over a year.

(M. Williams February 1, 2024 Decl., Doc. 177-1 ¶ 30). Ms. Williams further

contends that although she had "physical possession" of the Provider Statements

at the time they were first added to the privilege log in May 2022, she did not have

"actual knowledge of the nurses who were later determined to have been consulted

. . . until September 2023" (to be clear – after discovery had ended). (Doc. 177-1 ¶

31). This assertion is not credible.

Under Rule 26, Defendant has an obligation to conduct a reasonable inquiry

into the factual bases underlying its discovery responses.

> The comments to subsection (g)(1) clarify that Rule 26(g) broadly
> "imposes an affirmative duty to engage in pretrial discovery in a
> responsible manner that is consistent with the spirit and purposes of
> Rules 26 through 37." FED.R.CIV.P. 26(g) advisory committee's note.
> This broad duty is satisfied when an attorney makes "a reasonable
> inquiry into the factual basis of his response, request, or objection."
> Id. Specifically, the attorney's investigation and conclusions drawn
> therefrom must be reasonable under the circumstances.

*In re Delta/AirTran*, 846 F. Supp. 2d at 1350. An attorney signing a disclosure

must certify that it is "complete and correct to the best of h[er] knowledge,

information and belief formed after a reasonable inquiry[.]" *Id.* at 1349.

"Rule 26(g) does not require a signing attorney to certify the truthfulness of

a client's factual responses to a discovery request," but it does require the attorney

to certify that he or she "has made a reasonable effort to assure that the client has

provided all of the information and documents available to him that are responsive

to the discovery demand." *Collins-Williams v. Contour Eastwyck LLC*, 2022 WL

17828934, at *95 (N.D. Ga. Dec. 15, 2022) (quoting *State Farm Mut. Auto Ins. Co. v. New Horizon, Inc.*, 250 F.R.D. 203, 219 – 20 (E.D. Penn. 2008)); *see also Higgs v. Costa Crociere S.P.A. Co.*, 969 F.3d 1295, 1305 (11th Cir. 2020) ("Rule 26 of the Federal Rules of Civil Procedure makes it abundantly clear that a party's discovery obligations extend far beyond disclosure of the identities of witnesses it intends to call at trial." (citing Fed. R. Civ. P. 26(a)(1) advisory committee's note to 2000 amendment ("'Use' includes any use at a pretrial conference, to support a motion, or at trial. The disclosure obligation is also triggered by intended use in discovery, apart from use to respond to a discovery request ....")).

It is patently clear that Defendant, and its counsel, did not conduct a reasonable inquiry in compliance with Rule 26(e) and (g) in responding to Plaintiffs' discovery requests. This failure is exacerbated by the fact that by the time discovery began in this case, Defendant had been in possession of Plaintiffs' administrative claim for over three years. All information that was in Defendant's possession related to the case was certainly available to it by the time discovery began. Yet Defendant and its counsel did not do the work of ensuring that the names of all witnesses named in the documents in its possession were promptly provided to Plaintiffs. "Federal Rule of Civil Procedure 34 makes it clear that it is the responding party's duty to search its own data." *Collins-Williams*, 2022 WL 17828934, at *97 (citing *In re Ford Motor Co.*, 345 F.3d 1315, 1317 (11th Cir. 2003)). To the extent that some documents had not been yet provided to Ms. Williams at the time she answered the discovery initially, she and her client had an

obligation to ensure that the responses were appropriately supplemented under Rule 26(e). They did not do so.[34]

### 2. Privilege Log

As discussed above, it was not until February 12, 2024 (about six months after discovery ended) that Defendant submitted a privilege log cataloging all of its privileged documents and communications. Once the Court became involved in September 2023, Defendant amended its privilege log nine times between September 14, 2023 and February 9, 2024, including adding documents that had never been identified during discovery (and then ultimately deciding that most of those documents should be produced to Plaintiffs). As referenced earlier, Defendant's current lead counsel has also further updated discovery production in this last month leading up to trial. Many issues that have now arisen in this case could have been avoided had Defendant timely provided adequate privilege logs during discovery.

### a. Withholding of Provider Statements

Defendant's withholding of the Provider Statements under an assertion of privilege under 38 U.S.C. § 5705 poses material problems. It appears, given the information before the Court, that Defendant and its counsel assumed that the Provider Statements could properly be withheld under this statutory privilege — but that assumption was not diligently investigated.

---

[34] Although Defendant's failure to supplement its responses with the names of a few additional witnesses might, in other circumstances, be deemed a minor violation, this violation is only one of a disturbing pattern of discovery violations detailed in this Order.

Defendant has given shifting explanations for how the 38 U.S.C. § 5705 privilege initially came to be asserted. At first, when asked, Defendant asserted that the Provider Statements were "part of a peer review process that took place during the AIB." According to Defendant's counsel,

> The reference to 38 U.S.C. § 5705 was included on the privilege log along with the attorney client and attorney work product privileges for those statements because they were part of a peer review process that took place during the AIB . . . While that peer review meets the definition of a peer review under Georgia law, the undersigned has recently learned that it did not fit within the VA's definition of 38 U.S.C. § 5705, and upon learning this, Defendant has since removed that reference on the privilege log.

(Doc. 124 at 8; M. Williams Nov. 22, 2023 Decl., Doc. 125-3 ¶ 3). But as discussed during the December 14, 2023 Hearing, per VA policies, 38 U.S.C. § 5705 privileged reviews appear to be siloed from other types of reviews, and VA documents are explicit about the fact that other types of reviews, such as AIB investigations, should not overlap with those that are subject to 38 U.S.C. § 5705. According to the AIB Handbook,

> Inquiries within the Quality Assurance program, such as focused reviews and root cause analyses, may involve information protected from disclosure within and outside VA pursuant to 38 USC § 5705 and its implementing regulations . . . **AI[B]s must be conducted separately and apart from Quality Assurance inquiries and with due regard to preventing unauthorized disclosure of protected quality assurance documents.** Individuals with knowledge of confidential quality assurance information specific to the matter under investigation by an AIB may not serve on the AIB or disclose such information to the AIB.
>
> . . .
>
> **Documents protected from disclosure by 38 USC § 5705**
> (certain records generated as part of VA healthcare quality assurance

reviews, including focused reviews, root cause analyses, etc.) **are generally not available to Administrative Investigations and may not be included in investigative files or reports**.

(Doc. 125-1 at 15, 24 (emphases added)).

Months later, however, counsel's explanation changed to contend that the Provider Statements were "Report of Contact" statements that were "[f]ollow up documents" relating to "adverse event reporting" pursuant to 38 U.S.C. § 5705. (*See* M. Williams Jan. 31, 2024 Decl., Doc. 170-1 ¶ 4).

> I had a good faith basis prior to September 27, 2023, for asserting 38 U.S.C. § 5705 protection over 5 documents: 5 Report of Contact ("ROC") Provider Statements from Pam Brown (2 statements), Sunja Watson, Deborah Jenkins, and Robin Thomas. "Follow up documents" such as the ROC Provider Statements who had contact with Mr. Anderson during this "adverse event" are also considered confidential and privileged, adverse event reporting, which is protected under 38 U.S.C. § 5705. See VHA Directive 2008-077 at p.3, para (i).

It appears that neither Defendant nor its counsel investigated the scope of documents in this case that were actually privileged under 38 U.S.C. § 5705 prior to asserting the privilege. The fact that the VA allegedly classified the Provider Statements as "Report of Contact" or "follow up" statements was not asserted — to the Court's knowledge — until well after the Motion for Sanctions was filed.[35] Defendant's counsel did contend during the December 14, 2023 Hearing that the Provider Statements were "follow up documents" privileged under the applicable

---

[35] The Court is unable to ascertain, without more information, what is actually considered a "Report of Contact" under applicable VA regulations. Defendant has provided no additional information in support of this contention.

VHA Directive. But this appears to be a post-hoc rationalization for the use of this powerful and unique governmental privilege throughout discovery — and given the shifting explanations, it certainly does not appear that either Defendant or its counsel thoroughly examined the issue. Then, of course, Defendant promptly dropped the assertion once the Court began reviewing the issue.

Ms. Williams's subsequent February 1, 2024 Declaration (Doc. 177-1) restates the information from her prior Declaration with some differences, including adding the fact that

> During discovery in this case, on or about May 12, 2022, Sunja Watson or Sam Strother emailed statements to me the following five providers who were involved in the care of Mr. Anderson on November 16, 2016: Deborah Jenkins, Robin Thomas, Sunja Watson, Janell McKethan and Pamela Brown (the "2016-2017 Report of Contact ("ROC") Provider Statements").

(Doc. 177-1 ¶ 4).

This February 1, 2024 Declaration is important for several reasons. First, it is the first time it is mentioned that Ms. Williams might have been sent the Provider Statements by Mr. Strother of VA Risk Management – meaning that Defendant's counsel may have been in communication with VA Risk Management much earlier than previously represented to the Court. Second, and significantly, it also confirms for the first time that Defendant (and its counsel) was in possession of Ms. McKethan's Statement many months before the Statement was sent to Ms. Williams by Ms. McKethan's private counsel in February 2023.

Defendant has still not clearly explained to the Court whether Defendant's counsel spoke to anyone at VA's Risk Management department about the scope of

relevant documents that might be in that Department's possession until the Court's directive prompted defense counsel in September 2023 to submit the Provider Statements for *in camera* review in this initial post-discovery period. As noted above, Ms. Williams's February 1, 2024 Declaration provides an indication that she might have had some contact, at least via email, with Mr. Strother in the Risk Management Department as early as May 12, 2022, but she does not clearly state whether it was Mr. Strother or Ms. Watson that she emailed with.[36] (Doc. 177-1 ¶ 4).

Notably, though, Ms. Watson's testimony during her June 7, 2022 deposition causes the Court to doubt whether Ms. Watson was the person who sent the Provider Statements in May 2022. Ms. Watson stated that at least her own Provider Statement had been written of her own volition shortly after the incident, and she later provided it to Risk Management. (*See* Doc. 125-2 at 59:4-17). Nurse Watson noted, at Ms. Williams' prompting, that in preparing for the deposition she had reviewed her statement, "which is just like going back in [her] own diary." (See Doc. 125-2 at 59:4-5). Nurse Watson then stated,

> it's something just as part of general good practice that . . . clearly this was something that questions were going to be asked. Clearly this was something that practices were going to be attempted to be improved upon. So it was incumbent upon me [sic] just good practice to go ahead and at the time of the event record my statements of, you know, what occurred in relation to the event. And all that information was provided accordingly anytime I've been asked for it.

---

[36] This information should be reasonably ascertainable from email records, and the Court does not understand why Ms. Williams would leave it vague, other than to potentially obscure the Court's understanding of the situation.

(Doc. 125-2 at 59:9-17). Plaintiffs' counsel then clarified, "provided to counsel you mean or risk management?" (Doc. 125-2 at 59:18). Nurse Watson responded, "Risk management and yeah, counsel." (Doc. 125-2 at 59:19). When asked again for clarification, "Did anyone direct you to do that [write a statement]?" Nurse Watson answered, "No, sir. Again, just standard good practice." (Doc. 125-2 at 60:5-6).

Later, when asked if she directed any other providers to prepare statements about the incident, Nurse Watson did not recall, but she did note that "anything that would have been provided to me, I would have provided directly to risk management." (Doc. 125-2 at 82:11-83:1). Ms. Watson's lack of recollection about other providers' statements at the time of her deposition in June 2022 (less than a month after the date that Ms. Williams states that she might have received the Provider Statements via email from Ms. Watson) certainly adds weight to the argument that Ms. Watson was not actually the person who emailed the Provider Statements to Ms. Williams in May 2022.

This testimony also indicates that no later than the time Ms. Watson's deposition was taken (June 7, 2022), Defendant's counsel should have had reason to question whether at least Ms. Watson's Provider Statement actually fell within 38 U.S.C. § 5705 privilege, given that she created it herself at no one else's direction. Further, Defendant's counsel by then had reason to know (if she did not already) that at least Ms. Watson's Statement was, or should have been, in the possession of VA Risk Management. And if Ms. Williams was in fact in touch with Mr. Strother as early as May 2022, it defies understanding why neither of them

would have, at that point, searched for and reviewed the entire universe of documents in Risk Management's possession related to Mr. Anderson's care. Either way, there are serious deficiencies in the Government's compliance with discovery disclosure rules.

Specifically with regard to Ms. McKethan's Provider Statement, Ms. Williams's February 1, 2024 Declaration clarifies that she was in possession of Ms. McKethan's Statement at least eight months earlier than previously represented. (Doc. 177-1 ¶ 4). The Court, until this February 1, 2024 Declaration, was led to understand that Ms. Williams did not receive a copy of Ms. McKethan's Statement until the week prior to Ms. McKethan's deposition in February 2023. Ms. Williams previously stated that she received a copy of Ms. McKethan's Statement in the week before Ms. McKethan's deposition, but allegedly relied on representations made by Ms. McKethan's private counsel that the Statement was part of a "quality assurance" review. (M. Williams January 31, 2024 Decl., Doc. 170-1 ¶¶ 15-17). She did not open or review the document herself at that time, and immediately thereafter lost track of the Statement and neglected to place it on a privilege log until after discovery had ended. (M. Williams January 31, 2024 Decl., Doc. 170-1 ¶¶ 15-17).

Certainly, whether counsel had "actual knowledge" of Ms. McKethan's Statement or not, the Statement was indisputably in Defendant's possession and control for the entire length of discovery. *See, e.g.*, *Searock v. Stripling*, 736 F.2d 650, 653 (11th Cir. 1984) ("Control is defined not only as possession, but as the

legal right to obtain the documents requested upon demand."); Fed. R. Civ. P. 34. It was Defendant and its counsel's responsibility to ensure that all responsive documents were either produced or properly privilege-logged, and that the privileges it was asserting had a proper basis. The later issues that arose with regard to Ms. McKethan — particularly the Modified Subpoena Form — perhaps could have been avoided had counsel been diligent during discovery with regard to Ms. McKethan's Statement.

After considering all the facts and circumstances, the Court finds Defendant's failure to appropriately investigate its assertion of 38 U.S.C. § 5705 privilege and to promptly disclose the Provider Statements during discovery violated Rule 26(a) and (e) and was not substantially justified or harmless. Indeed, this failure deprived Plaintiffs of necessary information and adversely affected Plaintiffs' conduct of depositions and discovery. Defendant's deeply flawed discovery management and actions caused significant harm to Plaintiffs' capacity to conduct discovery and present their claims to this Court. The Court therefore finds that sanctions under Rule 37(c) are appropriate.

### b. Failure to Obtain and Subsequent Withholding of AIB Documents & Management Review Form

As stated in the previous section, Defendant's failure to locate and produce all relevant documents in its possession (or properly maintain a privilege log) throughout the entire period of discovery also caused its failure to identify the AIB Documents, the Management Review Form, and other highly relevant review documents.

Defendant points out that VA counsel Elizabeth Blair did not report the existence of an AIB in the privileged litigation report she created and sent to the USAO on October 7, 2021 — leading to Ms. Williams' incorrect understanding early in the case that no AIB had occurred. (*See* Elizabeth Blair Jan. 30, 2023 Decl., Doc. 171-1 ¶ 25-26 ("When I submitted my Litigation Report to the USAO, I reported that a peer review had not been conducted, and that per Risk Management, no Administrative Investigation Board [] was required in this case . . . [I] erred telling the USAO that there was no AIB.")).

The Court is left to take Defendant's counsel's word that she did not discover the existence of the AIB investigation until September 2023. Ms. Williams stated,

> I found out about the AIB during a September 2023 phone call with VA Risk Manager Sam Strother. I called Mr. Strother because the Court had asked for the specific dates on which the Provider Statements were made, and the dates of the administrative investigation. Since the statements (except for Thomas') were undated, I asked Sam Strother to see if he could locate the dates during a September 2023 phone call. As a result of these discussions, Counsel for Defendant learned of the AIB for the first time.

(*See* M. Williams Jan. 31, 2024 Decl., Doc. 170-1 ¶ 7). But the Court finds, just as with the Provider Statements, that Defendant's failure to conduct a proper search for statements and possible AIB documents and to identify and produce these documents during discovery was in violation of Rules 26(a) and (e), and was not substantially justified or harmless. The Court thus finds it appropriate to impose sanctions under Rule 37(c).

54

### 3. Modified Subpoena Form

With regard to the Modified Subpoena Form, Defendant's counsel, Ms. Williams, repeatedly stated that "that they made a mistake, acknowledges and takes responsibility for that mistake, and apologizes for that mistake." (Doc. 185 ¶ 78). According to Defendant's counsel, the Modified Subpoena Form arose out of its good faith attempt to correct the record with regard to the inconsistences between Ms. McKethan's Provider Statement and her statements during her deposition.

Nonetheless, the egregiousness of the conduct in all the circumstances surrounding the Modified Subpoena Form cannot be overstated. Counsel directed the creation of the inappropriately modified form by a staff member, and directed the form to be issued to a witness who was clearly outside of the Court's subpoena power — and who had, for months, clearly eschewed counsel's efforts to speak with her on a voluntary basis. Counsel then used the coercive power of the judicial system and the U.S. Attorney's Office to effectively force the witness's compliance, without even an arguable legal basis for doing so. Then, counsel met with Ms. McKethan by videoconference pursuant to that coercive power — knowing that neither Plaintiffs' counsel nor the Court was aware that Defendant had issued such a "subpoena" in the first place. Finally, counsel elicited numerous, significantly material changes to Ms. McKethan's deposition testimony during a meeting that was not recorded and that Plaintiffs' counsel was not privy to, effectively poisoning Plaintiffs' ability to ever obtain clear and truthful testimony from this key witness.

As Plaintiffs' counsel expounded during the December 14, 2023 Hearing:

[Defendant's counsel] . . . didn't just set the [meeting with Ms. McKethan] up in ten minutes. It's not like they happened to get [Ms. McKethan] on the phone and [said] we've got to do this thing right now . . . this was coordinated over a week or two weeks. They didn't call us. I wouldn't be complaining about a subpoena if they would have said, hey, we're going to have a meeting. Do you want to join? . . . We'll give you a copy of the subpoena when you get here.

The issue is it was an *ex parte* meeting that [Ms. McKethan] didn't want to participate in that was compelled with all the force and effect of the Northern District of Georgia and the United States Federal Government and a lawyer signed off on it. I mean, there's nothing probably [] more compelling than a no-knock warrant to get what you want, and the Government's office knows better than that . . .

The rule says what the subpoena can be used for. The courts or the clerks or somebody have generated a form. This [Modified Subpoena Form] took a lot of work to go in and get it looking exactly in the same font and all that.

(Doc. 155 at 76:17-77:18).

It is clear that Defendant's counsel's issuance of the Modified Subpoena Form violated the requirements of Rule 45 in nearly every possible way. First, issuing a subpoena to a witness to appear for an off the record interview is impermissible in both civil and criminal cases. Second, Defendant did not serve notice and a copy of the subpoena on Plaintiffs' counsel, as required by Rule 45(a)(4). Third, Ms. McKethan was not within the geographical limitations of the Court's subpoena power. Fourth, Ms. McKethan was not afforded a reasonable amount of time to object to the subpoena, as it was served on her one business day before her expected compliance. And finally, the issuance of the improperly

"modified" subpoena under all of these circumstances was coercive and inconsistent with standard discovery protocols.

The "subpoena" issued to Ms. McKethan certainly imposed an undue burden and expense on her in violation of Rule 45. At a minimum she incurred costs in terms of her time spent responding to the "subpoena," speaking with Defendant's counsel, and reviewing her deposition testimony and statement and drafting the Declaration she ultimately sent Defendant's counsel. In response to the "subpoena," she also re-engaged her private counsel for the purpose of speaking with Defendant's counsel, and although the Court is without information on any payment for her counsel's services, she likely paid attorney fees of several hundred dollars or more for those services. She may have also lost wages or incurred other costs unknown to the Court. "More specifically," though, "when 'a subpoena should not have been issued, literally everything done in response to it constitutes an undue burden or expense within the meaning' of the Rule." *Wagner v. Gallup*, Inc., 2014 WL 2808914, at *2 (D. Minn. June 20, 2014), *aff'd*, 788 F.3d 877 (8th Cir. 2015) (quoting *Spin Master Ltd. v. Bureau Veritas Consumer Prods. Serv.*, 2013 U.S. Dist. LEXIS 125470, at *16–17 (W.D.N.Y. Aug. 29, 2013)).

Although Rule 45(d)(1) requires that "[a] party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena," and imposes sanctions for failure to do so, the correct court to impose such a sanction is "the

court where compliance is required."[37] Rule 45 does not appear to contemplate a situation like this one – where a "subpoena" is purported to be issued by the Court but in fact is substantively and procedurally improper.

Accordingly, to issue a sanction for this conduct, the Court must rely on its inherent powers to do so – meaning that it must make a finding of bad faith. *See Barnes v. Dalton*, 158 F.3d 1212, 1214 (11th Cir. 1998) ("The key to unlocking a court's inherent power [to sanction] is a finding of bad faith."); *Purchasing Power*, 851 F.3d at 1223 ("As a starting point, the inherent-powers standard is a subjective bad-faith standard."). As discussed above, Defendant and its counsel argue that they did not act in bad faith in issuing the Modified Subpoena Form – they instead contend they were acting in a good faith attempt to fulfill the duty of candor to the Court in seeking via the subpoena to clarify prior deposition testimony. (*See* Dec. 14, 2024 Hearing Trans., Doc. 155 at 68). That explanation, though, does not address counsel's complete departure from governing rules for conducting a deposition and providing proper notice.

While there may not have been subjective bad faith here, "in the absence of direct evidence of subjective bad faith, this standard can be met if an attorney's conduct is so egregious that it could only be committed in bad faith." *Id.* (citing

---

[37] The "court where compliance is required" is distinct from "the issuing court" in the current language of Rule 45. The "issuing court" is "the court where the action is pending – *i.e.*, this Court. Rule 45(a)(2). In this circumstance, this Court cannot be the "court where compliance is required" due to the geographical limitation in Rule 45(c). *See Wagner*, 2014 WL 2808914, at *2 ("The subpoenas at issue commanded attendance at a location in another district . . . the plain language of Rule 45(d)(1) prevents this Court from directly invoking it.").

*Roadway Exp.*, 447 U.S. at 767). This requires a finding beyond "simple recklessness." *Purchasing Power*, 851 F.3d at 1225. "Bad faith exists when the court finds that a fraud has been practiced upon it, or 'that the very temple of justice has been defiled,' . . . or where a party or attorney knowingly or recklessly . . . delays or disrupts the litigation[] or hampers the enforcement of a court order." *Githieya*, 608 F. Supp. 3d at 1296–98 (quoting *Allapattah*, 372 F. Supp. 2d at 1373).

The Court has conducted a wide-ranging search in an attempt to locate similar violations of the Court's subpoena power, but has not found a situation exactly akin to this one. For instance, in *Medmarc Cas. Ins. Co. v. Reagan L. Grp., P.C.*, a party issued a subpoena "after discovery had closed and without leave of the Court" and "failed to serve the subpoena on defendants or notify defendants" of it. 2007 WL 9701778, at *2 (N.D. Ga. June 22, 2007). However, upon realizing the error, the party "acted promptly to rectify his failure to give notice of the subpoena, agreed not to use the documents, and turned them over to defendants." *Id.* The Court found that the other party had suffered "little, if any" actual prejudice because the subpoenaing party had turned over all of the documents, and declined to impose sanctions. *Id.*

In contrast, the Eleventh Circuit affirmed that the district court appropriately sanctioned a party for issuing an out-of-time subpoena where "Plaintiff had adequate opportunity to discover the demanded documents through the normal discovery process," but, "on the eve of trial, Plaintiff used a subpoena

in an effort to improperly reopen discovery." *Progressive Emu Inc. v. Nutrition & Fitness Inc.*, 785 F. App'x 622, 628 (11th Cir. 2019). And in that case, "[c]ompounding the problem, the subpoena clearly failed to comply with Rule 45. The subpoena, which demanded compliance in less than one business day, failed to allow a reasonable time to respond. The subpoena also improperly required compliance from an entity beyond the 100-mile geographical limit of Rule 45(c)." *Id.* Although the district court in that case awarded sanctions under Rule 45, the Eleventh Circuit found that the "trial subpoena . . . not only violate[d] Rule 45, it reflect[ed] a bad faith attempt to subvert court-imposed discovery deadlines," and, "[a]s such, the [district] court would also have been justified to find that [p]laintiff acted in bad faith to circumvent the discovery deadline and use its inherent power to impose sanctions and award fees for counsel's litigation abuses." *Id.* at 631, n.13.

"[A]n attorney issuing a subpoena may not take her role lightly and is duty-bound to ensure the propriety of a subpoena that she signs and serves." *Wagner*, 2014 WL 2808914, at *3. "The circumstances involving the [] subpoena[] at issue reflect a serious dereliction of that duty because no authority exists for the type of subpoena[] issued." *Id.*; *see also Murphy v. Bd. of Educ. of Rochester City Sch. Dist.*, 196 F.R.D. 220, 227 (W.D.N.Y. 2000) ("[W]hen an attorney misuses his or her power under Rule 45 to command a non-litigant to produce documents in a lawsuit to which he or she is a stranger by failing to give appropriate notice to the parties, public confidence in the integrity of court processes is eroded." (quoting

*Potomac Elec. Power Co. v. Electric Motor Supply, Inc.*, 190 F.R.D. 372, 380 (D. Md. 1999))).

The Court has located no case in which the court-provided subpoena form was substantially manipulated before it was served on a third-party. Similarly, the Court has not located a case in which Defendant's counsel held an *ex parte* interview pursuant to such a manipulated subpoena with a recalcitrant witness – much less one in which the witness then substantially changed her testimony. The Court finds that this conduct is such that "that the very temple of justice has been defiled," *Chambers*, 501 U.S. at 46. Even without subjective bad faith, the Court finds that imposing sanctions for this conduct based on its inherent powers is absolutely necessary.

### B. Appropriate Sanctions

Sanctions under Rule 37 are intended to 1) compensate the court and other parties for the added expense caused by discovery abuses, 2) compel discovery, 3) deter others from engaging in similar conduct, and 4) penalize the offending party or attorney. *Wouters v. Martin Cnty., Fla.*, 9 F.3d 924, 933 (11th Cir. 1993) (citing *Carlucci v. Piper Aircraft Corp.*, 775 F.2d 1440, 1453 (11th Cir. 1985); *National Hockey League v. Metropolitan Hockey Club, Inc.*, 427 U.S. 639, 643 (1976)).

Plaintiffs request that the Court strike Defendants' Answer and/or grant default judgment to Plaintiffs as a sanction for the totality of Defendant's, and its counsel's, misconduct. (Doc. 115 at 19). During the hearing on the Motion for Sanctions, the Court discussed with counsel possible alternative sanctions, should

the Court find that striking Defendant's Answer was not warranted. (*See* Dec. 14, 2023 Hearing Trans., Doc. 155 at 140-150[38]). The Court "referenced the possibility of reaching certain [factual] findings in advance" of trial. (Doc. 155 at 150). Defendant's counsel also proposed "offer[ing] to pay [Plaintiffs'] costs voluntarily." (Doc. 155 at 151).[39]

Unfortunately, Defendant's misconduct in the discovery process has substantially obstructed Plaintiffs' ability to obtain the proper scope of evidence and testimony relevant to the case on a timely basis, prior to the close of discovery. Now, nearly eight years have passed since the events at issue. Many key witnesses who were once available as active VA employees have now retired or moved on to other employment, and indisputably their memories of the incident have continued to fade with the passage of time. In addition, the pattern of obfuscation and delay throughout discovery – and for more than six months after the discovery period ended — has continued to significantly prejudice Plaintiffs.

The Court notes that on June 10, 2024, weeks prior to the scheduled trial, Defendant admitted liability through its filed stipulations. (Doc. 200). After extended review and consideration of the course of events and misconduct in this litigation, the Court finds that it would be too severe a sanction to strike Defendant's Answer and/or to grant full default judgment for Plaintiffs, inclusive

---

[38] These page numbers refer to the CM/ECF page number.

[39] The Court inquired on May 23, 2024 as to Defendant's current position on this issue. Defendant is apparently willing to seek authority for such payment, but has not yet done so because no amount of costs has been identified.

of a specific damages amount. But, the seriousness of Defendant's discovery violations and the significant additional time and resources Plaintiffs have had to expend due to Defendant's delays and conduct cannot go without consequence and sanctions pursuant to Rules 26 and 37 and the inherent authority of the Court.

The Court finds it appropriate, as an additional sanction for Defendant's discovery abuses under Rules 26 and 37 and the Court's inherent power, to find the following additional facts (beyond those identified by Defendant in its June 10, 2024 stipulations (Doc. 200) and the parties' stipulations listed in Attachment E to their Draft Amended Consolidated Pretrial Order (Doc. 205 at 43-49)) as established for all purposes in this action:

1. Mr. Anderson was consciously and actively in distress during some portion of the time between the insertion of the Dobhoff tube and his passing out. (Doc. 174 ¶ 7 (citing Doc. 115-1, Provider Statements, at 16; Doc. 159-2, Jenkins AIB Statement, at 9:7–19; 10:6–14; 21:1-4)).[40]

2. The VA's management review, completed on December 2, 2016, found that the standard of care was not met as to Mr. Anderson's care.[41]

Additionally, with regard to specific witnesses and evidence, the Court finds as follows:

1. Per Defendant's representations during discovery, Deborah Jenkins, charge nurse on duty at the time of the November 16, 2016 incident, could not be located and Defendant "had no contact information for her beyond a non-working phone number" because Nurse Jenkins had retired from VA in 2020. (Doc. 185 ¶¶ 61, 62). But, on October 6, 2023, the Court directed

[40] Notably, Defendant has admitted in its Stipulations that "**[a]t least** 15 minutes elapsed between [Mr. Anderson] demonstrating the signs of respiratory distress and his eventual loss of consciousness." (Doc. 206 ¶ 3 (quoting Doc. 173 ¶ 11 (emphasis added))).

[41] As noted above, the parties have stipulated to this fact. (*See* Attachment "E" to Draft Am. Consol. Pretrial Order, Doc. 205 at 46, ¶¶ 29-31).

Defendant to provide Plaintiffs with any emergency contact information VA had for Nurse Jenkins. (October 6, 2023 Order by Docket Entry Only; Doc. 185 ¶ 62). On October 27, 2023, Ms. Williams emailed Plaintiffs' counsel, stating, "the VA has conducted another search and was finally able to locate Nurse Jenkins" and provided a phone number for her. (Doc. 185 ¶ 62; Doc. 159-10 at 1). Because Plaintiffs were unable to depose Nurse Jenkins due, at least in part, to Defendant's incorrect representations that she was unable to be located and it "had no contact information for her," the Court will consider her statement to the AIB (Doc. 159-2) as testimony for all purposes. The Court also will make the inference that any additional deposition testimony Nurse Jenkins would have given would have been unfavorable to Defendant.

2. At trial, Plaintiffs may use information from Ms. McKethan's provider statement, deposition, and/or her November 2023 declaration/errata sheet to the extent they wish. Defendant may not dispute Plaintiffs' presentation of Ms. McKethan's testimony.

3. The Government's failure to disclose the Provider Statements, Management Review Form, and AIB Documents during discovery caused Plaintiffs unnecessary trouble and expense as well as adversely impacted Plaintiffs' ability to conduct the full scope of discovery that a case such as this one properly demands.

Finally, under Federal Rule of Civil Procedure 37(c)(1)(A), the Court may "order payment of the reasonable expenses, including attorney's fees, caused by the failure [to disclose or supplement]." The Court hereby **NOTIFIES** the parties that the Court intends, at minimum, to order Defendant to pay Plaintiffs' reasonable attorney's fees and expenses caused by Defendant's failures to disclose and supplement. At the close of the upcoming bench trial, the Court will confer with counsel regarding a feasible date for a hearing regarding attorneys' fees. At the hearing regarding fees, counsel should expect to present argument and evidence as to 1) which fees and expenses were "caused by" Defendant's misconduct; and 2) the reasonableness of Plaintiffs' fees and expenses. *See*

*Goodyear Tire & Rubber Co. v. Haeger*, 581 U.S. 101, 109 (2017) ("the complaining party . . . may recover 'only the portion of his fees that he would not have paid but for' the misconduct." (quoting *Fox v. Vice*, 563 U.S. 826, 836 (2011)). The Court anticipates that it will post-trial provide additional directives regarding any matters to be addressed later in connection with the fee hearing and any outstanding sanctions relief issues.

## IV.    Conclusion

Plaintiffs' Motion for Sanctions (Doc. 115) is **GRANTED IN PART** and **DENIED IN PART**.

**IT IS SO ORDERED** this 6th day of August, 2024.

**AMY TOTENBERG**
**UNITED STATES DISTRICT JUDGE**