IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

WEBB ANDERSON, as the surviving
child of Jesse James Anderson,
deceased; and DONNA ANDERSON,
as administrator of the Estate of
Jesse James Anderson,

    Plaintiffs,

    v.

UNITED STATES OF AMERICA,

    Defendant.

:
:
:
:
:
:
:
:
:
:
:
:
:
:

CIVIL ACTION NO.
1:21-cv-3226-AT

## ORDER

## I.     Introduction and Background

This Federal Tort Claims Act ("FTCA") medical malpractice case arises from the Atlanta VA Medical Center's handling of Jesse James Anderson's medical treatment on November 16, 2016. This treatment resulted in Mr. Anderson's death on November 18, 2016. Mr. Anderson, a devoted military veteran, was 70 years old at the time of his death. The Government has admitted liability in this case.

Prior to Mr. Anderson's death, he had for many years lived in a small residence on land adjacent to his son's home in a rural part of North Georgia. Mr. Anderson was an integral member of his son's family and played an active role in the lives of his grandchildren.

Mr. Anderson's surviving son, Webb Anderson, and daughter-in-law, Donna Anderson (in her capacity as administrator of Mr. Anderson's estate),

originally filed this federal tort claim administratively on July 18, 2018, with the Office of the Chief Counsel of the Department of Veterans Affairs. (Compl., Doc. 1 ¶ 2). When the FTCA administrative process was exhausted and proved unsuccessful, the case was filed in this Court in 2021.

The case was initially litigated through discovery that was scheduled to close in August 2023. As the Government had failed to produce proper and complete privilege logs and failed to produce a significant array of relevant non-privileged documents, the Court ultimately held a sanctions hearing on December 14, 2023, regarding serious discovery nondisclosures and other mishandling of this case. (*See* Doc. 129 (sanctions hearing); Doc. 220 (Order Granting in Part and Denying in Part Plaintiffs' Motion for Sanctions)). The sanctions hearing focused on misconduct in the discovery process as well as by some Government representatives.[1] Counsel for the Government agreed to engage in further production of documents and discovery over the course of the next months. The Government ultimately stipulated to liability in this case on June 10, 2024. (Doc. 200). By that date, the Government had belatedly produced documentation of two internal VA medical reviews conducted in 2016 and 2017. One of these reviews, the nursing management review, expressly recognized that the medical treatment provided to Mr. Anderson did not meet the requisite standard of medical care.

---

[1] *See* Doc. 220 (Order Granting in Part and Denying in Part Plaintiffs' Motion for Sanctions).

Prior to the trial in this case, the parties agreed to the stipulations outlined in Section II below. Thereafter, the case was tried before the Court in a bench trial on damages held from August 7, 2024, through August 13, 2024. (*See* Trial Transcripts, Docs. 237–241). Each party has now submitted their proposed findings of fact and conclusions of law. (Docs. 247, 248). The parties' proposed findings provide additional detail and further substance to the skeletal stipulations filed before trial.

## II.    Stipulations of the Parties

Prior to trial, the parties stipulated to the following facts. (*See* Am. Consolidated Pretrial Ord., Doc. 211 at 43–48). The Court lists these stipulations below but also notes that it makes additional findings of fact in the course of this Order, as the stipulations are somewhat limited in detail and scope.

1. This civil action arises out of medical treatment of Mr. Jesse James Anderson following his November 4, 2016 admission to the Atlanta VA Medical Center ("VAMC") for an elective right carotid endarterectomy.

2. At all times relevant to the events giving rise to this Action, Ryan Moore, Deborah Jenkins, Emily Lagergren, Sunja Watson, Janell McKethan, Robin Thomas, Ian An-Kwok Wong, Maybil Sibymon, Heather Bloom, Luke Brewster, Craig Jabley, Richard Belcher, Jamis Gouge, Dennis Lester, Fagan Fraser, Mia Blake, and Pamela Brown were agents/employees of the Atlanta VAMC and were acting within the express, implied, or apparent scope of their agency or employment with the Atlanta VAMC and the United States of America.

3

3. On November 4, 2016, Mr. Jesse James Anderson, a 70-year-old United States Army Veteran, was admitted to the Atlanta VAMC for an elective right carotid endarterectomy.

4. During Mr. Anderson's surgery, he suffered a cranial nerve IX injury due to the surgery performed by Dr. Luke Brewster on November 4, 2016, which compromised his ability to swallow and required him to utilize a feeding tube.

5. In the days following his surgery, Mr. Anderson was obtaining his nutrition via a Dobhoff tube.

6. A Dobhoff tube is a slender, flexible tube utilized with patients who need nutrition but are unable to eat normally.

7. During the early morning hours of November 16, 2016, Mr. Anderson's Dobhoff tube came out.

8. At approximately 8:00 a.m. on November 16, 2016, Nurse Pamela Brown advised Dr. Jamis Gouge, a medical resident who was on the vascular team rotation and providing care to Mr. Anderson, that Mr. Anderson's Dobhoff tube had come out.

9. Nurse Brown asked Dr. Gouge what he wanted to do with regard to the Dobhoff tube.

10. Dr. Gouge responded that Nurse Brown should reinsert the Dobhoff tube into Mr. Anderson.

11. Nurse Brown advised Dr. Gouge that placing Dobhoff tubes with a mercury tip was out of her scope of practice and that Dr. Gouge would have to find someone from his team to insert the Dobhoff tube.

12. Nurse Brown had not inserted a Dobhoff tube before and had not been trained to insert Dobhoff tubes.

13. Nurse Brown had previously observed other nurses insert Dobhoff tubes.

14. For the next several hours, Dr. Gouge argued with the nursing staff, insisting that placing such tubes was within a nurse's scope of practice and that nursing personnel should place the tube as opposed to the vascular team.

15. Nurse Brown eventually agreed to reinsert a Dobhoff tube into Mr. Anderson.

16. When Nurse Brown inserted the Dobhoff tube into Mr. Anderson, it was misguided into Mr. Anderson's trachea and through his vocal cords.

17. The mal-positioning or misplacement of a Dobhoff tube is a known complication.

18. During the insertion of the Dobhoff tube, Mr. Anderson experienced coughing and gagging.

19. Following the insertion of the Dobhoff tube, Mr. Anderson's vital signs showed increased heart rate, elevated systolic pressure, and low oxygen saturation.

20. The medical providers did not attempt to withdraw the Dobhoff tube from Mr. Anderson while he was conscious.

21. At 15:21 (3:21 p.m.), Dr. Gouge placed an order for Lorazepam (Ativan) for Mr. Anderson.

22. Nurse Brown administered Lorazepam (Ativan) to Mr. Anderson.

23. Mr. Anderson lost consciousness at some point after being given Ativan.

24. At some point, the Rapid Response team and the Code team were called.

25. Mr. Anderson was eventually partially resuscitated by the Code team.

26. Mr. Anderson's oxygen deprivation caused him to suffer an anoxic brain injury that left him comatose and with a profound neurological injury with no reasonable probability of recovery.

27. Because of Mr. Anderson's hypoxic ischemic encephalopathy and the absence of a reasonable probability of recovery, life support was withdrawn.

28. Mr. Anderson died on November 18, 2016, at the Atlanta VAMC.

29. On November 30, 2016, the VA conducted a Management Review regarding the events leading to the death of Mr. Anderson.

30. On December 2, 2016, Kelley Wood MSN, RN-BC prepared a written Management Review, detailing her findings regarding the events leading to the death of Mr. Anderson.

31. The Management Review concluded that the standard of medical care was not met.

32. The Director of the Atlanta VAMC convened an Administrative Investigation Board ("AIB") to investigate the events leading to the death of Mr. Anderson.

33. The AIB was chartered on December 23, 2016, and was completed on February 9, 2017.

34. The AIB interviewed multiple witnesses involved in this matter, took sworn testimony from them, and had the actions of the providers involved in Mr. Anderson's care on November 16, 2016, reviewed by other VA professionals, some of whom were outside of the Atlanta VAMC.

35. On February 9, 2017, the AIB issued its final report.

36. Kermit Webb Anderson is the surviving child of Jesse James Anderson.

37. Donna Anderson is the administratrix of the Estate of Jesse James Anderson.

38. The medical records of Jesse James Anderson at BATES 000001–003921 are true and accurate copies of Mr. Anderson's medical records and are authenticated without further proof.

39. The United States' medical providers at all times were acting within the scope of their employment at the Atlanta Veterans Administration Medical Center.

40. The United States owed Mr. Jesse James Anderson a duty of care in his post-surgical treatment on November 16, 2016.

41. The United States breached that duty of care by mal-positioning the Dobhoff tube, on November 16, 2016, in Mr. Anderson's trachea.

42. The United States breached that duty of care by failing to timely recognize the mal-positioned feeding tube.

43. The United States breached that duty of care by failing to immediately engage in or call for rescue attempts, including by immediately withdrawing the mal-positioned Dobhoff tube, providing life-saving interventions such as a cricothyrotomy, or giving life-saving medications.

44. The United States breached that duty of care by ordering and administering to Mr. Anderson Ativan, an anxiety medication that is also a respiratory depressant.

45. The United States breached that duty of care by failing to recognize the mal-positioned feeding tube and failing to direct the care providers who were present with Mr. Anderson to immediately withdraw the tube and engage in rescue efforts or call for the appropriate personnel who could rescue Mr. Anderson.

46. The United States' breach of the duty of care resulted in Mr. Anderson's pain and suffering, both physical and mental.

47. The United States' breach of the duty of care resulted in Mr. Anderson's anoxic brain injury.

48. The United States' breach of the duty of care resulted in the wrongful death of Mr. Anderson.

## III.   Findings of Fact

The following section constitutes the Court's Findings of Fact pursuant to Federal Rule of Civil Procedure 52(a)(1). The Court has made its Findings of Fact based on the testimony and exhibits presented at trial, and discusses only issues considered material to the resolution of the parties' claims. *See I.N.S. v.*

8

*Bagamasbad*, 429 U.S. 24, 25 (1976) ("[C]ourts . . . are not required to make findings on issues the decision of which is unnecessary to the results they reach.")).

### A. Mr. Jesse Anderson's Background, Military Service, and Career

Mr. Anderson[2] was born in 1946 and raised in Dahlonega, Georgia. (Aug. 12, 2024 Trial Tr., Doc. 240 at 9).[3] Shortly after high school, he was drafted into the United States Army and served three tours in Vietnam during the Vietnam War. (*Id.* at 9–10).

Mr. Anderson received several commendations during his time in the Army, including an award for exceptional valor. (Pl.'s Ex. 143; Aug. 9, 2024 Trial Tr., Doc. 239 at 193-94 (Matthew Anderson describing Mr. Anderson's "ARCOM [Army Commendation Medal] with the V device for valor")). One commendation described his "exceptionally valorous actions on 19 May 1968 while serving as a perimeter guard" at a base camp in Vietnam. (Pl.'s Ex. 143 at 11). When the base camp came under attack from enemy rockets, Mr. Anderson "remained at his post although it offered no overhead protection from the falling shrapnel and debris. By choosing to remain at his post rather than seeking shelter, [Mr.] Anderson kept the perimeter secure should a ground assault follow the enemy rocket attack." (*Id.*). The commendation noted that his "conspicuous gallantry and unselfish devotion

---

[2] References to "Mr. Anderson," unless otherwise noted, are to Mr. Jesse James Anderson, deceased. His son Webb and grandsons Ty and Matthew are referred to using their first names for clarity.

[3] Trial transcript page numbers refer to the CM/ECF page number unless otherwise noted.

to duty . . . reflect great credit upon himself, his command, and the United States Army." (*Id.*).

After returning from Vietnam, Mr. Anderson worked much of his life as a stone mason, including owning his own masonry business. (Aug. 12, 2024 Trial Tr., Doc. 240 at 10–12). His son Webb also recalled that his father worked in the field of automotive paint and body and did other work as needed to make ends meet. (*Id.* at 11–12).

### B. Mr. Jesse Anderson's Family and Community Relationships

Mr. Anderson's son, Webb, lived with him full-time after Mr. Anderson and his wife divorced when Webb was about 12 years old. (Aug. 12, 2024 Trial Tr., Doc. 240 at 12). Webb ultimately entered the field of masonry along with his dad. (*Id.* at 10–11). Webb testified that his father "never met a stranger," and that he and his father were much alike in that both "want to introduce ourselves to people and meet other people and get new stories and share our stories." (*Id.* at 16). He described his father as "a blast to be around," with a "laugh that was contagious." (*Id.*).

Webb testified that Mr. Anderson's life changed substantially for the better after he first became connected with the VA's services, including group therapy, in the 1980s. (*Id.* at 13–14). Mr. Anderson loved helping other veterans navigate the process of beginning treatment and obtaining services at the VA, and even would help them fill out paperwork and coordinate transportation to the VA. (*Id.* at 16; Aug. 8, 2024 Trial Tr., Doc. 238 at 103–104). In addition, Mr. Anderson kept up

relationships with veterans from his troop in Vietnam, and would travel the country to visit them on occasion. (Aug. 12, 2024 Trial Tr., Doc. 240 at 16–17).

The trial testimony indicates that Mr. Anderson had close and loving family relationships. For many years, Mr. Anderson lived on the same property as Webb, Webb's wife Donna, and their two sons, Ty and Matthew. (*Id.* at 17). Donna Anderson recalled that Mr. Anderson would take them all fishing and cook for the family. She also testified that he was a "wonderful father-in-law" to her, a "very good guy" and "very positive man" who "loved life," and she never heard him "say a cuss word or speak bad in front of me or my kids." (*Id.* at 39–40).

Mr. Anderson "doted over" and was "very engaged" with his two grandsons. (*Id.* at 17, 39). Both grandsons testified about their grandfather's love of animals, particularly his several dogs, and that he would spend quality time with them (his grandsons) fishing at a nearby pond together and cooking the fish they caught. (Aug. 9, 2024 Trial Tr., Doc. 239 at 191–93). His grandsons described him as a "loving man" and "gentle giant" who took care of them their entire lives. (*Id.* at 193–95). Mr. Anderson was proud of his grandsons' accomplishments and would often brag about them. (Aug. 12, 2024 Trial Tr., Doc. 240 at 17, 47–48).

Mr. Anderson would often travel to see his older grandson Ty's wrestling matches around the region, sometimes sneaking in and out undetected by his family and only later revealing that he had been in the gymnasium watching Ty "beat up on" other wrestlers. (*Id.* at 17–18, 46). Ty Anderson testified that his grandfather was a "confidant" and "place of refuge" for him. (*Id.* at 47–48). Ty

Anderson works now as a correctional officer, and he has applied his grandfather's quality of "never know[ing] a stranger" and "being open for a relationship . . . or a talk with anybody" regularly in his own life and work, particularly with men coming into the prison who need someone to talk to. (*Id.* at 49–50).

Mr. Anderson's younger grandson, Matthew, who is currently completing his college degree, testified that he was inspired to enter military service because of his grandfather, starting with junior ROTC (Reserve Officers' Training Corps) while in high school, and later joining college ROTC and the Georgia Army National Guard. (Aug. 9, 2024 Trial Tr., Doc. 239 at 187–191). Matthew Anderson testified that he wanted to continue his grandfather's legacy of "selfless service" and upholding Army values. (*Id.* at 189–91).

Finally, Mr. Anderson's longtime friend Alan Trench, a fellow veteran, testified at trial about their more than 20-year-long friendship. (Aug. 8, 2024 Trial Tr., Doc. 238 at 98–111). Mr. Trench described Mr. Anderson as "a joy to be around" who was there for him 100 percent "when the chips [we]re down." (*Id.* at 101). The two would frequently drive to the VAMC in Atlanta together for various treatments and therapy groups. (*Id.* at 100–102). Mr. Trench drove Mr. Anderson to the VAMC for both of his carotid surgeries and he was planning to pick up Mr. Anderson when he was released after the November 2016 surgery. (*Id.* at 102).

Mr. Anderson helped Mr. Trench connect with specialists in Atlanta when Mr. Trench was diagnosed with prostate cancer. (*Id.* at 102–103). They would fish and care for animals together. (*Id.* at 100–101). When they couldn't get together in

person, including when Mr. Trench was caring for his wife while she suffered from Alzheimer's disease, he and Mr. Anderson would talk on the phone four or five times a week. (*Id.* at 101–102). Mr. Trench described himself and Mr. Anderson as "as close as two men could be without being a couple." (*Id.* at 108). Mr. Trench believed that if Mr. Anderson was still alive, the two of them would "still be raising hell together." (*Id.* at 109).

The testimony of Mr. Anderson's family and Mr. Trench uniformly painted Mr. Anderson as someone who "loved life." (Aug. 12, 2024 Trial Tr., Doc. 240 at 28, 32, 40). They also described him as "enthusiastic for life," "pretty active," "a very viable human being," (Aug. 8, 2024 Trial Tr., Doc. 238 at 102), and "a free spirit" who did not "sit anywhere long," (Aug. 12, 2024 Trial Tr., Doc. 240 at 17).

### C. Mr. Jesse Anderson's Health and Life Expectancy

The parties presented both fact and expert testimony regarding Mr. Anderson's health and life expectancy at the time of his death. In combination with the testimony from his family and friends, the Court considers this evidence in assessing Mr. Anderson's life expectancy.

### 1. Fact Testimony

As discussed in detail above, the testimony indicates that prior to his death, Mr. Anderson led a fulfilling, self-sufficient life pursuing his passions and hobbies and had loving, supportive, enjoyable relationships with his family and friends.

In addition, Mr. Anderson's family members recalled that he was feeling much better after his left carotid endarterectomy was completed at the VAMC in

September 2016, and they recalled him telling them he felt "10 to 15 years younger" after the surgery. (Aug. 9, 2024 Trial Tr., Doc. 239 at 196; Aug. 12, 2024 Trial Tr., Doc. 240 at 19). Webb and Donna had helped Mr. Anderson apply for his passport prior to his death because he wanted to go on a cruise with them in the future. (Aug. 12, 2024 Trial Tr., Doc. 240 at 19). Webb Anderson testified that the last time he spoke to Mr. Anderson before his death, he was happy, "having fun . . . walking around the hospital talking to people and meeting new friends," and was looking forward to coming home in the next two days after his PEG tube[4] was placed. (*Id.* at 26). Mr. Trench testified that the two of them were planning to do things in the future together. (Aug. 8, 2024 Trial Tr., Doc. 238 at 102).

Webb testified that Mr. Anderson had been a "functional alcoholic" until the late 1980s. (Aug. 12, 2024 Trial Tr., Doc. 240 at 13–14). After that, the two of them would sometimes drink a beer together, but Webb never knew his father to drink to the point of drunkenness. (*Id.* at 13–14). Webb described Mr. Anderson's happiness and pride at coming near his 25th "birthday" (in Mr. Anderson's words) since stopping his alcohol abuse. (*Id.* at 14).

During his tours in Vietnam, Mr. Anderson had significant exposure to Agent Orange.[5] (*Id.* at 14). Webb Anderson and Mr. Trench both noted that Mr.

---

[4] As discussed *infra*, Mr. Anderson had a complication from his right carotid surgery which most likely would have required him to use a percutaneous endoscopic gastronomy ("PEG") tube for three to six months for nutrition and fluid support purposes.

[5] As explained by the VA, Agent Orange was a "tactical herbicide used by the U.S. military for control of vegetation," which was sprayed during the Vietnam War. U.S. Department of Veterans Affairs, *Public Health – Agent Orange*, https://perma.cc/3A7Z-NXD4.

Anderson's work in Vietnam included "cutting up barrels of Agent Orange." (Aug. 8, 2024 Trial Tr., Doc. 238 at 105–106; Aug. 12, 2023 Trial Tr., Doc. 240 at 15). According to Webb, Mr. Anderson had a 100% service-connected disability rating from the VA beginning when he had a heart attack in 1996. (Aug. 12, 2024 Trial Tr., Doc. 240 at 14). Webb testified that his father received about $3,500 per month in VA and social security benefits, for a total income of about $42,000 per year. (*Id.* at 33–34).

### 2. Expert Testimony

Three experts, all physicians, testified at trial about Mr. Anderson's health history and life expectancy. Dr. Luke Brewster is a vascular surgeon affiliated with Emory University and the VAMC; he conducted both of Mr. Anderson's carotid endarterectomy surgeries.[6] (Aug. 8, 2024 Trial Tr., Doc. 238 at 112–113, 120–21). Dr. Brewster testified about his care of Mr. Anderson and described Mr. Anderson's medical history based on his review of the medical records. (*See generally* Aug. 8, 2024 Trial Tr., Doc. 238 at 119–224). Dr. Schweiger, Plaintiffs' expert witness, is a physician at Tampa General Hospital and a professor at the University of South Florida College of Medicine, specializing in anesthesia and

---

Exposure to Agent Orange is associated with certain diseases and cancers, including Type 2 diabetes and coronary artery disease. *See* U.S. Department of Veterans Affairs, *Public Health – Veterans' Diseases Associated with Agent Orange*, https://perma.cc/V2NP-LLH7.

[6] Dr. Brewster, as a treating physician, was not designated as a testifying expert witness under Rule 26. Nonetheless, no party disputes that he would be qualified to testify as an expert in the field of vascular surgery.

critical care medicine. Dr. Schweiger has also published over 350 articles and numerous chapters in medical treatises and books. (Aug. 9, 2024 Trial Tr., Doc 239 at 14–15). He was designated as an expert in airway management and related symptoms, conscious pain and suffering, life expectancy, and codes. (*See generally id.* at 6–18). Dr. Klancke is Defendant's expert witness, who was designated as an expert in cardiology and cardiovascular diseases.[7] (*See generally* Aug. 12, 2024 Trial Tr., Doc. 240 at 62–77). Dr. Klancke ceased his active medical practice in cardiology in Florida as of September 1, 2019, but has continued to serve as an expert witness in a range of cases. (*Id.* at 68–69, 165).

### a. Mr. Anderson's Relevant Health History

Mr. Anderson developed coronary artery disease[8] starting around 1995, had peripheral arterial disease, and had several heart attacks in the 1990s. (Aug. 12, 2024 Trial Tr., Doc. 240 at 80, 125; Med. Rs., Pls.' Ex. 24 at 1262 ("several MIs [myocardial infarctions] between 5/95 and last in 1998"); Aug. 8, 2024 Trial Tr., Doc. 238 at 189). He had coronary artery bypass surgery in 1995, during which three grafts were placed. (Aug. 12, 2024 Trial Tr., Doc. 240 at 80; Med. Rs., Pls.' Ex. 24 at 1262 ("CABG [coronary artery bypass graft] x 3 in 1995 done here at the VAMC")). Mr. Anderson was diagnosed with congestive heart failure in

---

[7] Plaintiffs challenged Dr. Klancke's opinion about Mr. Anderson's life expectancy. (Aug. 12, 2024 Trial Tr., Doc. 240 at 77). The Court finds it appropriate to consider his opinion, but has given it the amount of weight the Court deems appropriate.

[8] As noted above, the VA has recognized coronary artery disease as associated with Agent Orange exposure.

approximately 2001. (Aug. 8, 2024 Trial Tr., Doc. 238 at 187-189; Aug. 12, 2024 Trial Tr., Doc. 240 at 98; Med. Rs., Pls.' Ex. 24 at 3869, 1264).

Dr. Klancke testified that Mr. Anderson's medical records show damage to portions of his heart muscle, known as ischemic cardiomyopathy, such that he met the criteria to have a defibrillating device (an implantable cardioverter-defibrillator, or "ICD") inserted in his chest in approximately 2001. (Aug. 12, 2024 Trial Tr., Doc. 240 at 83–86, 97–98). The eligibility criteria for an ICD, which were established through a large medical study referred to as MADIT-II, are an "ejection fraction less than 35 percent but no [] clinical arrhythmic events." (*Id.* at 83–86).

Ejection fraction refers to the difference between "the amount of blood in the heart when it is completely filled versus the amount of blood when it is completely contracted." (*Id.* at 86). Dr. Klancke noted that from highest to lowest reliability, the methods of measuring ejection fraction are echocardiogram, cardiac catheterization, and nuclear stress test. (*Id.* at 87–88). Mr. Anderson had an echocardiogram done in June 2016, in which his ejection fraction was 30 to 35%, compared to a normal range in a healthy individual between 50 and 55%. (*Id.* at 88–89; Med. Rs., Pls.' Ex. 24 at 000510). In Dr. Klancke's opinion, Mr. Anderson's ejection fraction testing over time showed that between the early 2000s and 2016, Mr. Anderson's ejection fraction had stabilized and likely improved a bit with his use of medications, but it still indicated "severe" impairment in 2016. (Aug. 12, 2024 Trial Tr., Doc. 240 at 94–97).

In September 2016, Mr. Anderson was referred to the VA's cardiology department due to left carotid stenosis (blockage). (*Id.* at 80; Med. Rs., Pls.' Ex. 24 at 473). His self-reported symptoms included recent occasions of difficulty in recalling particular words, face numbness, and intermittent right-hand numbness. (Aug. 8, 2024 Trial Tr., Doc. 238 at 184–87; Med. Rs., Pls.' Ex. 24 at 473). Mr. Anderson had symptomatic left carotid artery stenosis, with the "degree of stenosis at the worst levels to be over 90 percent." (Aug. 8, 2024 Trial Tr., Doc. 238 at 190–95). Dr. Brewster testified that at that time, Mr. Anderson had significant blockages in both his left and right carotid arteries. (Aug. 8, 2024 Trial Tr., Doc. 238 at 119, 185). Mr. Anderson had also previously experienced a transient ischemic attack ("TIA"), which is colloquially referred to as a "mini-stroke," generally lasting a few minutes but not causing long-lasting problems. (Aug. 12, 2024 Trial Tr., Doc. 240 at 72–73, 225–226). A TIA is a predictor of future stroke, or a "time-sensitive neurologic warning," as Dr. Klancke put it. (*Id.* at 225–26).

Dr. Brewster explained Mr. Anderson's pre-surgery RAI ("risk assessment index," *see id.* at 223) score, which assesses the likelihood that a patient will die from other causes within approximately a year after the surgery. (Aug. 8, 2024 Trial Tr., Doc. 238 at 191–92). Mr. Anderson's score was 11, on a scale of 0 (least likely) to 45 (most likely). (Aug. 8, 2024 Trial Tr., Doc. 238 at 191–92; Aug. 9, 2024 Trial Tr., Doc. 239 at 112–115). This score was well below the cutoff of approximately 36–37, at the high end. (Aug. 8, 2024 Trial Tr., Doc. 238 at 191–92; Aug. 9, 2024 Trial Tr., Doc. 239 at 112–115).

Dr. Brewster also testified that, according to Mr. Anderson's pre-surgery carotid score, Mr. Anderson's estimated life expectancy prior to the two carotid surgeries was more than five years. (Aug. 8, 2024 Trial Tr., Doc. 238 at 215–16, 219–20). Dr. Schweiger agreed with Dr. Brewster's estimate based on Mr. Anderson's carotid score (and also opined as to his own estimate of Mr. Anderson's life expectancy, discussed *infra*). (Aug. 9, 2024 Trial Tr., Doc. 239 at 115).

Due to the symptomatic nature of the left carotid blockage, Mr. Anderson's first carotid endarterectomy surgery was on his left side. (Aug. 8, 2024 Trial Tr., Doc. 238 at 192–95). Each surgery was scheduled to take approximately 2.5 to 3 hours, and Mr. Anderson was placed under general anesthesia for both surgeries. (*Id.* at 180). The first surgery was successful, without complications, and Mr. Anderson was discharged the day after the surgery, September 24, 2016. (*Id.* at 121, 194–96).

### b. November 4, 2016 Right Carotid Endarterectomy Surgery and Complications

On the right side, Mr. Anderson's blockage was asymptomatic, but still associated with an elevated risk of stroke, so he was scheduled for the right carotid endarterectomy surgery in November 2016. (Aug. 8, 2024 Trial Tr., Doc. 238 at 193). The second surgery took place on November 4, 2016, but resulted in several complications. Shortly after Mr. Anderson was extubated after the second surgery, he slipped into respiratory distress and had to be intubated again in the operating room. (*Id.* at 123–25; Aug. 9, 2024 Trial Tr., Doc. 239 at 105–107). On the following day, November 5, 2016, when Mr. Anderson was extubated, he again

required reintubation — and again entered respiratory distress, with his oxygen saturation dipping to 40%. The medical personnel present placed a call for a "Code 99" (synonymous with "Code Blue"), requiring immediate resuscitation and other life-saving treatment. (Med. Rs., Pls.' Ex. 24 at 001124, 001826; Aug. 8, 2024 Trial Tr., Doc. 238 at 124–26; Aug. 9, 2024 Trial Tr., Doc. 239 at 153). Ultimately, Mr. Anderson was successfully extubated, and it appears from the records that his body tolerated this stress without further complication or major neurological injury. (Aug. 9, 2024 Trial Tr., Doc. 239, at 105–107).

The second surgery also resulted in Mr. Anderson developing a nerve palsy in his Cranial IX or glossopharyngeal nerve, which affected his speech and swallowing.[9] (Aug. 8, 2024 Trial Tr., Doc. 238 at 196–97). On November 15, 2016, Mr. Anderson was given a swallowing test, which he failed. (Pls.' Ex. 111 at 13). The medical records from that date note dysphasia, meaning abnormal swallowing, with "copious amounts of secretions" in Mr. Anderson's throat and frequent aspiration, "inconsistent sensation to aspiration," and coughing. (Med. Rs., Pls.' Ex. 24 at 001968; Aug. 8, 2024 Trial Tr., Doc. 238 at 201–209).

Dr. Brewster expected that Mr. Anderson's nerve palsy was temporary and would resolve within three to six months. (Aug. 8, 2024 Trial Tr., Doc. 238 at 221–22). In the meantime, as previously noted, Mr. Anderson was to have a temporary PEG tube placed, which would deliver nutrients directly to his stomach, thereby

---

[9] It is not alleged that the nerve palsy was caused by negligence; it is a known complication of carotid surgery.

bypassing the need to swallow while the nerve palsy resolved. (Aug. 8, 2024 Trial Tr., Doc. 238 at 221–22; Aug. 9, 2024 Trial Tr., Doc. 239 at 108–109). Mr. Anderson was scheduled to be discharged to his home after the PEG tube was placed. (Aug. 9, 2024 Trial Tr., Doc. 239 at 109–112).

### c. Summary of Doctors' Life Expectancy Opinions

### i. Dr. Brewster, Plaintiff's VA Surgeon

Dr. Brewster's opinion as to Mr. Anderson's life expectancy was that, according to his pre-surgery workup in September 2016, Mr. Anderson's RAI and carotid scores indicated that if he completed both carotid surgeries, he would have a life expectancy greater than five years. (Aug. 8, 2024 Trial Tr., Doc. 238 at 215–16, 218–220; Med. Rs., Pls.' Ex. 24 at 000476). Dr. Brewster's discharge summary for Mr. Anderson, written after his death, indicated that Mr. Anderson's hypertension, diabetes, hyperlipidemia, coronary artery disease, stroke,[10] and peripheral artery disease were all noncontributory to his death. (Aug. 8, 2024 Trial Tr., Doc. 238 at 221–22; Med. Rs., Pls.' Ex. 24 at 000386–88). Dr. Brewster's discharge summary also noted that, prior to the Dobhoff misplacement, Mr. Anderson was "recovering with an improving deficit of a likely [cranial nerve IX] palsy and had a planned [PEG]." (Med. Rs., Pls.' Ex. 24 at 000388).

---

[10] The Court is not clear on what "stroke" Dr. Brewster was referring to here — it likely appears to be the TIA discussed earlier.

### ii. Defendant's Expert Witness, Dr. Klancke

Dr. Klancke's opinion, as presented at trial, is that prior to either of his carotid endarterectomy surgeries, Mr. Anderson had one to two remaining years of life expectancy. (Aug. 12, 2024 Trial Tr., Doc. 240 at 77–78). Dr. Klancke's opinion was that, while Mr. Anderson's successful left carotid endarterectomy in September 2016 significantly reduced his risk of stroke, it did not affect his overall projected life expectancy. (*Id.* at 153–54). Dr. Klancke's opinion was based on his experience as a cardiologist as well as several journal articles which he referred to during his testimony.[11] (*Id.* at 126–51).

Dr. Klancke noted that, according to the research he reviewed (which surveyed patients who had bypass surgery between 1973 to 1979, and was published in 2003), on average, a patient who underwent a bypass surgery under the age of 50 had a 51% chance of surviving 20 years. (*Id.* at 126–31). He also noted that some risk factors, such as hypertension, might make a patient's life expectancy slightly worse. (*Id.* at 130–31). Given that Mr. Anderson had his bypass surgery in 1995 at the age of 49, Dr. Klancke expected that his life expectancy from the time of that surgery (considering no other factors) would be approximately 20 years — *i.e.*, until about 2015. (*Id.* at 130–34).

Dr. Klancke continued on to discuss Mr. Anderson's life expectancy based on his congestive heart failure. (*Id.* at 136–45). Dr. Klancke referred to another

---

[11] Under Federal Rule of Evidence 803(18), these journal articles and their corresponding charts were referred to as demonstratives but not admitted.

article, also published in 2003, for this opinion. (*Id.*). Dr. Klancke described the life expectancy given the level of Mr. Anderson's congestive heart failure and ejection fraction to be approximately 5 years. However, this projection is lengthened by the placement of the ICD, as discussed below. (*Id.* at 145).

Finally, Dr. Klancke considered the effect of Mr. Anderson's implantable cardioverter-defibrillator ("ICD") on his life expectancy.[12] (Aug. 12, 2024 Trial Tr., Doc. 240 at 146–151). Mr. Anderson's ICD was placed in 2004. (*Id.* at 149–50). Dr. Klancke noted that the ICD placement improved Mr. Anderson's life expectancy somewhat, and for a patient with congestive heart failure and an ejection fraction of 30% or less, he would tell them they have approximately 5 years of life expectancy, which would increase to 9.5 years with the placement of an ICD. (*Id.* at 146–47). For this statistic, he used a study published in 2020, which followed patients at the VA between 2007 and 2015. (*Id.* at 147–50). For study patients in the same age group as Mr. Anderson, about 50% survived until about 7 years after placement, and about 40% survived about 8 years. (*Id.* at 150). Therefore, Dr. Klancke's projection based on the ICD placement was that Mr. Anderson likely would have survived until about 2012, though in fact Mr. Anderson lived until late 2016, when he died as a result of the malpractice at issue in this lawsuit. (*Id.* at 149–51).

---

[12] An ICD is a small battery-powered device placed under the skin on the chest that continually tracks heart rate and rhythm, including irregular heart rhythms ("arrhythmias"), and restores regular heart rhythms when needed to correct arrhythmia. *See* Implantable Cardioverter Defibrillator, Cleveland Clinic, https://my.clevelandclinic.org/health/treatments/17123-implantable-cardioverter-defibrillator-icd.

Dr. Klancke further opined that Mr. Anderson had survived as long as he had, given his health conditions, in part because of the "really good" healthcare he was receiving with the VA, and partially due to luck. (*Id.* at 152). Mr. Anderson took some medications that helped his conditions, such as a beta blocker, an ACE (angiotensin-converting enzyme) inhibitor, and Lasix, and he used a CPAP (continuous positive airway pressure) machine. (*Id.* at 105–106). But Dr. Klancke noted that Mr. Anderson was not managing some of the risks of his health conditions. (*Id.* at 105–106, 220). For instance, as of 2008, he was not compliant with the doctors' recommendations for his salt intake. (Med. Rs., Pls.' Ex. 24 at 001262). In addition, Mr. Anderson declined lipid therapy, which could have helped his cholesterol level and likely his carotid artery disease. (Aug. 12, 2024 Trial Tr., Doc. 240 at 106, 214; Med. Rs., Pls.' Ex. 24 at 000486). In addition, according to Dr. Klancke's review of Mr. Anderson's medical records, in July 2016, the doctors told Mr. Anderson to do "symptom-limited" activity only, and his ICD, which measured his upper body activity levels, showed a decreased level of upper body activity in 2016 from earlier years (going from approximately 2–4 hours of activity per day to a little over 1 hour). (Aug. 12, 2024 Trial Tr., Doc. 240 at 151; *compare* Med. Rs., Pls.' Ex. 24 at 001221 (showing patient activity at ~4 hours/day in April 2011), 001141 (showing patient activity at 3.6 hours/day in May 2013), *with* 001151 (showing patient activity at 1.5 hours/day in August 2016), 001149 (showing patient activity at 1.1 hours/day)). The Court notes, however, that Mr. Anderson's reduced activity capacity as of August 2016 likely would have been

positively impacted by the upcoming removal of the arterial blockages that his two planned surgeries in September and November 2016 were designed to address and remedy.

### iii. Plaintiff's Expert Witness, Dr. Schweiger

Finally, Dr. Schweiger testified about his opinion of Mr. Anderson's remaining life expectancy. (*See* Aug. 9, 2024 Trial Tr., Doc. 239 at 101–132). Dr. Schweiger agreed with Dr. Brewster's view that Mr. Anderson's RAI score supported a life expectancy of greater than 12 months, "at the very minimum," and his carotid score indicated a life expectancy greater than five years. (*Id.* at 114–116). As noted earlier, Dr. Schweiger also agreed with Dr. Brewster's testimony that if Mr. Anderson completed both carotid surgeries, he would have a life expectancy greater than five years. (Aug. 8, 2024 Trial Tr., Doc. 238 at 215–16, 218–220; Med. Rs., Pls.' Ex. 24 at 000476).

Dr. Schweiger disagreed strongly with Dr. Klancke's opinion of Mr. Anderson's life expectancy. (Aug. 9, 2024 Trial Tr., Doc. 239 at 134–35). In particular, Dr. Schweiger noted that the medical literature that Dr. Klancke's opinion relied upon used "data accumulated in the 1990s," before additional medical interventions were available, rendering that data less accurate for the 2016 time period. (*Id.* at 138–40).

Dr. Schweiger gave his life expectancy projection based on two federal government life expectancy tables. (*Id.* at 120). The first table was the National Vital Statistics Report from the United States Life Tables for 2016. (*Id.* at 123).

Based on Mr. Anderson's sex, ethnicity, and age, the table projected a life expectancy of 14.5 years. (*Id.* at 123–24). The second table was the Actuarial Life Table pertaining to 2016, published in the 2019 Trustee Report for the Social Security Population. (*Id.* at 125–26). That table provided that the projected life expectancy for a 70-year-old white male was 14.4 years.[13] (*Id.*). Therefore, Dr. Schweiger indicated that Mr. Anderson's mean projected life expectancy would be between 14.4 and 14.5 years. (*Id.* at 126).

Dr. Schweiger also noted that advancements in cardiac medicine since 2016 likely would have assisted Mr. Anderson's life span. (*Id.* at 135). In addition, although Mr. Anderson did have some health issues, Dr. Schweiger noted that he did not have "major cardiac valvular pathology" or diabetes, both of which indicated he was in a "more favorable position" as to life span. (*Id.* at 136).

### 3. Determination of Life Expectancy

The Court has engaged in a thorough consideration of all of the relevant evidence and expert testimony to assess what Mr. Anderson's life expectancy would have been, but for the malpractice in the handling of his post-surgical medical treatment on November 16, 2016. For the variety of reasons discussed by Dr. Schweiger as well as by Dr. Brewster (who personally and professionally was very familiar with Mr. Anderson's medical and personal profile), the Court finds

---

[13] The Court notes that the two major national studies discussed by Dr. Schweiger were clearly based on a broad range of individuals who were 70 years of age and whose medical status, given their age, varied significantly.

that Dr. Klancke's assessment of Mr. Anderson's life expectancy is unsound and based on outdated analyses and data.

While nothing in life or life expectancy projections is a sure bet, the weight of the evidence indicates that Mr. Anderson would have had a life expectancy between 5 and 14 years, but for his disastrous medical treatment on November 16, 2016. The Court notes that Mr. Anderson's active engagement with his family, his best friend, the VA, and fellow veterans, as well as with his VA physicians, all reflect his complete engagement with life. By contrast, an individual with Mr. Anderson's medical profile who lived alone in an elderly care facility might be subject to a variety of viruses, deficient caretaking and medical care, psychological deterioration due to loneliness, and other conditions that would result in a far shorter life span. But Mr. Anderson's personal engagement with his world as well as his strong support system and active use of VA medical care all speak to the probability of his living far longer than 5 years.

Based on all of these considerations, as well as the expert assessment of Dr. Schweiger, the Court finds that Mr. Anderson's life expectancy would have been in the range of 8 to 14.4 years, with the obvious "median" or midpoint number here being 11.2 years.

### D. Relevant Events of November 16, 2016

The Court incorporates by reference Stipulations 7–26 in Section II of this Order. The Court further makes the following additional findings.

### 1. The Timing of the Dobhoff Tube Insertion — Marking the Beginning of Mr. Anderson's Pain and Suffering

As an initial matter, the parties agree that Mr. Anderson experienced physical and mental conscious pain and suffering due to the misplaced Dobhoff tube for a *minimum* of 15–16 minutes, between 3:21 p.m. and 3:37 p.m. on November 16, 2016. (Def.'s Findings of Fact, Doc. 248 ¶ 80).

Plaintiffs contend, however, that the length of time Mr. Anderson consciously suffered was actually closer to 23 minutes.[14] Dr. Schweiger testified that, given his review of the evidence, Nurse Brown inserted the Dobhoff tube sometime before 3:21 p.m., because by 3:21 p.m. Dr. Gouge had placed the order for Ativan. (Aug. 9, 2024 Trial Tr., Doc. 239 at 43–44). Therefore, Dr. Schweiger's opinion is that the tube was inserted "at or before [3]:15 [p.m.]." (*Id.* at 43–44). Given the sequence of events as testified to by Nurse Brown, the Court finds it credible that the tube insertion was completed at approximately 3:15 p.m.

### 2. Misplacement of Dobhoff Tube and Response

Nurse Brown testified that Mr. Anderson coughed and gagged during the tube insertion. (Aug. 7, 2024 Trial. Tr., Doc. 237 at 79, 139–40). Nurse Brown did not recall Mr. Anderson speaking at any point after the insertion. (*Id.* at 74–75).

---

[14] Various witnesses' testimony and written statements conflict as to the exact timing of key events. One reason for this is that the clocks in various rooms in the VA hospital were not synchronized (Aug. 7, 2024 Trial. Tr., Doc. 237 at 300–301), and Nurse Sibymon testified that she recorded the time from her personal watch on her contemporaneous documentation (Aug. 9, 2024 Trial Tr., Doc. 239 at 179 ("Q: [] that [time] came from your wristwatch; true? A: That's correct.")). Where a time is more credible, such as the time an order was entered into the VA's computer system, the Court has noted that.

After the insertion, Mr. Anderson used the bedpan urinal next to his bed, and then laid back down. (*Id.* at 73–74). He started turning side to side and using his self-suctioning device, his face started to turn red and flushed, and his skin got clammy and sweaty. (*Id.* at 74–75, 143–44). Nurse Brown tried to get him comfortable, but he was looking more and more anxious. (*Id.* at 75). When Nurse Brown and Nurse Watson were able to get Mr. Anderson's vital signs, his heart rate and blood pressure were elevated. (*Id.* at 79).

At that point, Nurse Brown believed Mr. Anderson was showing signs of anxiety, so she spoke with Dr. Gouge and Dr. Gouge placed the Ativan (lorazepam) order at 3:21 p.m. (*Id.* at 83–84, 91–94; Am. Consolidated Pretrial Ord., Doc. 211 at 46, ¶ 21). Nurse Watson left the room and placed a call to radiology to request an x-ray to confirm the Dobhoff tube placement.[15] (Aug. 7, 2024 Trial. Tr., Doc. 237 at 214–16).

The Ativan order was "finished" by the pharmacist at 3:23 p.m., meaning at that point it was available to be retrieved from the nearby medication cart. (*Id.* at 245–46, 264–66). Nurse Watson was then briefly sidetracked by care for another veteran, but she retrieved the Ativan from the cart and returned to Mr. Anderson's room. (*Id.* at 217; Pls.' Ex. 111 at 7–8).

When Nurse Watson arrived back in the room, Mr. Anderson was still alert, but she noticed Mr. Anderson's face was paler than when she had been in the room

---

[15] That order was entered at 3:30 p.m. in the VA's computer system. (Med. Rs., Pls.' Ex. 24 at 002164 (ordering "Abdomen 1 view stat" at 15:30)).

before. (Aug. 7, 2024 Trial. Tr., Doc. 237 at 217–18). Nurse Brown administered the Ativan to Mr. Anderson via intravenous injection. (*Id.* at 83–84, 94–95, 148–49; Am. Consolidated Pretrial Ord., Doc. 211 at 46, ¶ 22). After Nurse Brown administered the Ativan, she noticed that Mr. Anderson seemed to relax, but she also thought he was looking pale. (Aug. 7, 2024 Trial. Tr., Doc. 237 at 84). The Government has stipulated that the administration of Ativan, an anxiety medication *and, significantly, a respiratory depressant*, breached the duty of care. (Am. Consolidated Pretrial Ord., Doc. 211 at 48, ¶ 44).

Nurse Watson left the room again to call a rapid response[16] at the nurse's station. (Pls.' Ex. 111 at 7–8). According to Nurse McKethan's statement, she was seated at the nurse's station when Nurse Watson arrived and notified her of the rapid response, which she immediately responded to. (*Id.* at 16). Nurse Thomas's statement[17] indicated that when he arrived in the room around the time of Nurse Watson's departure, he noticed that Mr. Anderson's oxygen saturation reading was 80% and his heart rate was 123, and he said rapid response needed to be called. (Pls.' Ex. 111 at 10-11; *see also* Aug. 7, 2024 Trial. Tr., Doc. 237 at 269–75). When Nurse McKethan arrived in the room shortly thereafter, she noted that Mr.

---

[16] A rapid response is generally called when there is an "impending cardiac or impending respiratory problem," in contrast to a Code 99 or Code Blue, which is called when the patient is already pulseless or not breathing. (Aug. 9, 2024 Trial Tr., Doc. 239 at 150; Aug. 7, 2024 Trial. Tr., Doc. 237 at 151–52, 257).

[17] Nurse Thomas did testify at trial, but based on his trial and deposition testimony, it appears he has developed significant memory problems since the time of the incident. Accordingly, the Court credits his handwritten statement dated November 20, 2016, as his most accurate recollection of the incident.

Anderson appeared cyanotic and his breathing was labored. (Pls.' Ex. 111 at 16). The nurses were at that point unable to obtain an oxygen saturation reading for Mr. Anderson. (*Id.* at 16). Nurse Thomas went to retrieve a non-rebreather mask[18] for Mr. Anderson, which Nurse McKethan placed on him. (Pls.' Ex. 111 at 11, 16).

The evidence indicates that at the time the rapid response team was called, Mr. Anderson was still conscious, but his condition was deteriorating and continued to worsen in the subsequent minutes. (Aug. 7, 2024 Trial. Tr., Doc. 237 at 88–89, 218–19; Am. Consolidated Pretrial Ord., Doc. 211 at 46, ¶ 22).

The evidence and testimony is generally consistent that Mr. Anderson lost consciousness after the rapid response call was made, but before anyone from the rapid response team arrived to the room. (*See* Pls.' Ex. 111 at 11 ("patient coded [sic] rapid response team arrived"), 14 ("Before rapid [r]esponse arrived pt. immediately went into respiratory arrest"), 16 ("Ms. McKethan did not see personnel from the rapid response team arrive at the patient's bedside"); Aug. 7, 2024 Trial. Tr., Doc. 237 at 152). Nurse McKethan noted in her statement that at 3:40 p.m., she noticed that Mr. Anderson's "respirations had ceased." (Pls.' Ex. 111 at 16). Nurse Brown testified that she saw Mr. Anderson slump over, then she, Nurse Jenkins, and Nurse McKethan checked Mr. Anderson for a pulse, which they were unable to locate. (Aug. 7, 2024 Trial. Tr., Doc. 237 at 151, 156–57). The nurses in the room then pressed the Code 99 button on the wall and adjusted Mr.

---

[18] A non-rebreather mask is a device that attaches to a patient's nose and mouth and delivers oxygen. *See* "Non-Rebreather Mask," Cleveland Clinic, https://my.cleveland clinic.org/health/treatments/25186-non-rebreather-mask.

Anderson's position to supine so they could initiate CPR. (*Id*. at 156–57, Pls.' Ex. 111 at 16).

Nurse Maybel Sibymon testified at trial that she responded to the rapid response call, which sounded on the overhead loudspeakers in the hospital.[19] (Aug. 9, 2024 Trial Tr., Doc. 239 at 167, 184). As was her normal practice, she noted the time of her arrival at Mr. Anderson's room, via her personal watch, as 3:37 p.m. (*Id*. at 168, 172, 180). In her assessment upon arrival to the room, she found Mr. Anderson to be cyanotic, unconscious and pulseless. (*Id*. at 170, 174–75). According to her, at that time, she and the other nurses in the room initiated code procedures, including calling the code by pressing a button on the wall in the room and beginning CPR. (*Id*. at 170, 175).

Meanwhile, Nurse Watson had been again sidetracked by another veteran needing assistance. But while in the other veteran's room, Nurse Watson overheard "commotion" from Mr. Anderson's room and someone in the room say, "call a code." (Aug. 7, 2024 Trial. Tr., Doc. 237 at 221–22; Pls.' Ex. 111 at 8). She left the other veteran's room and immediately went to the nursing station to make the code call to the overhead loudspeaker system, because she had not yet heard it sound. (*Id*. at 221–23). She noted in her statement that the time she did so was 3:44 p.m., according to the clock at the nurse's station. (*Id*. at 221–23).

---

[19] Nurse Sibymon did not have an independent recollection of these events; she reviewed documentation to prepare for her testimony. (Aug. 9, 2024 Trial Tr., Doc. 239 at 167).

By the time Nurse Watson returned to the room after calling in the code from the nurse's station, chest compressions and the code process had already started. (*Id.* at 256–57). The code sheet, written by another nurse, Nurse McKethan, indicates that the first dose of epinephrine, which would have been administered by a member of the code team, was given at 3:45 p.m.[20] (Med. Rs., Pls.' Ex. 24 at 002954; Aug. 7, 2024 Trial. Tr., Doc. 237 at 225–26).

Overall, the Court finds it most credible that Mr. Anderson lost consciousness at approximately 3:40 p.m. At that time, it appears the nurses began assessing his condition, including looking for a pulse, and adjusting his position to begin CPR. The code team members likely arrived within 1–2 minutes of that time and were able to administer epinephrine by 3:45 p.m. It also appears that multiple rapid response and code calls were made by various staff, which could account for some of the conflicting time calls. In addition, as noted above, the clocks within the VAMC were not synchronized, meaning that it is certainly possible that the clock in Mr. Anderson's room and the clock at the nurse's station were off by a minute or more.

In light of this finding, the Court finds that the evidence shows that Mr. Anderson experienced physical and mental conscious pain and suffering as the result of the Government's negligence for a total of 25 minutes, between 3:15 p.m., when the tube was first misplaced, and 3:40 p.m., when he lost consciousness.

---

[20] The code sheet, apparently erroneously, states that the code was initiated at 3:30 p.m. (*See* Def.'s Findings of Fact, Doc. 248 ¶ 24, fn. 4). Nurse McKethan's written statement stated that CPR began at 3:40 p.m. (Pls.' Ex. 111 at 16).

Although the medical testimony indicates that the partial suffocation may not have started immediately upon placement of the tube (*see* Aug. 9, 2024 Trial Tr., Doc. 239 at 100 (Dr. Schweiger stating that Mr. Anderson had physical discomfort starting at 3:21 p.m.)), the Court finds that Mr. Anderson still experienced pain and suffering starting at the time of the initial misplacement at 3:15 p.m.

### 3. Testimony Regarding Mr. Anderson's Conscious Pain and Suffering During and After Misplacement of Dobhoff Tube

Dr. Schweiger testified extensively from a medical standpoint about what Mr. Anderson experienced during the time the Dobhoff tube was misplaced. He described Mr. Anderson's deterioration after the misplacement of the tube as a "partial suffocation event." (Def.'s Findings of Fact, Doc. 248 ¶ 81; Aug. 9, 2024 Trial Tr., Doc. 239 at 84). In the first moments after the tube's misplacement, Mr. Anderson's oxygen saturation level was at 96 percent, and it "slowly but progressively deteriorated until it was witnessed to be in the 80s and then eventually it fell off." (Def.'s Findings of Fact, Doc. 248 ¶ 81; Aug. 9, 2024 Trial Tr., Doc. 239 at 84–85). A preponderance of the evidence indicates that Mr. Anderson experienced a laryngospasm toward the end of the partial suffocation event, leading him to pass out within three or four minutes of the laryngospasm occurring. (Def.'s Findings of Fact, Doc. 248 ¶ 81; Aug. 9, 2024 Trial Tr., Doc. 239 at 84–86).

Dr. Schweiger explained that the misplacement of the Dobhoff tube in Mr. Anderson "triggered bronchospasm or irritation from inside the lung, coupled with [] eventual laryngeal spasm, which means a closing of the inside of the throat,

where the vocal cords then progressively snap shut and prevent the entrainment of oxygen through the nose and mouth into the windpipe." (Aug. 9, 2024 Trial Tr., Doc. 239 at 40–41). This resulted first in insufficient oxygen in the blood and then "eventually a complete lack of oxygen in the blood," and simultaneously an inability to expel carbon dioxide. (*Id.* at 41). Dr. Schweiger described this situation of "low oxygen coupled with high carbon dioxide" as the "medical definition of acute respiratory failure," which ultimately resulted in Mr. Anderson's brain injury due to lack of oxygen and heart malfunctioning (pulseless electrical activity). (*Id.* at 41–43).

Dr. Schweiger testified that, based on the progressive drop in Mr. Anderson's oxygen level while the Dobhoff tube was misplaced, the buildup of carbon dioxide in his system, and his physiologic responses, he more likely than not suffered emotional terror, fear, and panic during the duration of his partial suffocation and eventual laryngospasm. (Def.'s Findings of Fact, Doc. 248 ¶ 79; Aug. 9, 2024 Trial Tr., Doc. 239 at 41, 83–84). Nurse Deborah Jenkins, in her statement to the AIB,[21] described the look in Mr. Anderson's eyes during this time as "looking up at me saying 'help,'" and Nurse Pamela Brown agreed with that statement in her own testimony. (Pls.' Ex. 119 at 20; Aug. 7, 2024 Trial. Tr., Doc. 237 at 118–19).

---

[21] In its August 6, 2024 Order on Sanctions, the Court found that Plaintiffs were unable to depose Nurse Deborah Jenkins "due, at least in part, to Defendant's incorrect representations that she was unable to be located and it 'had no contact information for her.'" (Doc. 220 at 63–64). The Court ruled that Nurse Jenkins's statement to the AIB would therefore be considered "testimony for all purposes." (*Id.* at 64).

Dr. Brewster testified that he expected a vocal cord spasm and the resultant inability to breathe would feel like "holding your breath until you passed out and then waking up underwater" and similar to drowning. (Aug. 8, 2024 Trial Tr., Doc. 238 at 160–61). He agreed that it would be a "terrifying, terrible experience," worsened by hearing the nurses in the room discuss him just being "nervous" and not being able to speak up to say he could not breathe. (*Id.* at 161).

Dr. Brewster also testified about the behavior of a first-year resident doctor, Dr. Gouge, who was on the vascular surgery team in charge of Mr. Anderson's care. (*Id.* at 161–76). As noted in the parties' Stipulations, Dr. Gouge repeatedly argued with several nurses throughout the day on November 16, 2016, demanding that a nurse replace Mr. Anderson's Dobhoff tube despite Nurse Brown's discomfort with doing so. Dr. Brewster explained that twice during Dr. Gouge's residency, he had to have a conversation with Dr. Gouge about his "bad attitude" in interacting with nurses and treating patients. (*Id.* at 161–62).[22] Plaintiffs also elicited evidence that Dr. Gouge may have misrepresented to the nurses that he or another member of his team had spoken with Mr. Anderson on November 16, 2016, and obtained his consent to replace the Dobhoff tube. (Aug. 7, 2024 Trial Tr., Doc. 237 at 60–65; Pls.' Ex. 111 (Nurse Pamela Brown's testimony and typewritten statement explaining that when she spoke with Mr. Anderson that day, he did not remember

---

[22] The Court admitted this evidence for the limited purpose of noting how Dr. Gouge's attitude might have affected both the patients he treated and the team working with him, and in turn, may have made the patients' treatment more painful. (Aug. 8, 2024 Trial Tr., Doc. 238 at 173).

a doctor saying that the Dobhoff needed to be replaced, and he told her that he did not want the Dobhoff tube replaced because he wanted the PEG tube to be placed instead, but he ultimately acquiesced to allowing her to place it)).

Certainly, if Dr. Gouge or another doctor had discussed the situation with Mr. Anderson, it could have helped Mr. Anderson better understand why they thought the Dobhoff needed to be replaced that day and given him the opportunity to voice his concerns about it. The lack of communication in combination with the grossly flawed medical care provided in connection with the Dobhoff replacement likely made his emotional and physical distress all the more grievous and terrifying.

Mr. Anderson desperately sought to breathe and physically move after his Dobhoff tube was replaced so that he might address his intense discomfort and rapidly progressing suffocation. But he could not move or act so as to reverse his terrifying progressive suffocation over the 25 minutes when he was conscious during the wholly flawed procedure and immediately thereafter. Mr. Anderson's embrace of life and total trust in his VA medical providers ultimately was cut short by grievous malpractice.

### 4. Testimony Regarding Mr. Anderson's Semiconscious and Unconscious Pain and Suffering and Funeral Expenses

Dr. Schweiger also offered his opinion regarding semiconscious and unconscious pain and suffering based on his experience working with patients

under anesthesia or recovering from a brain injury.[23] He noted that on the evening of November 16, 2016, into the morning of the following day, even though Mr. Anderson was under sedatives in a coma, he was still withdrawing from painful stimuli and had an observable gag reflex. (Aug. 9, 2024 Trial Tr., Doc. 239 at 27–28; Med. Rs., Pls.' Ex. 24 at 000909). After that, fentanyl was administered. (Med. Rs., Pls.' Ex. 24 at 000909). Mr. Anderson's arguably semi-conscious experience of his pain and medical circumstances appears to have dissipated by the evening and the next day when he was in a coma — though, as Dr. Schweiger has observed, Mr. Anderson may have experienced some gagging and other reflexes that might be deemed as "semiconscious" indicators. Mr. Anderson's life support was withdrawn around 5:50 p.m. on the following day (November 18) and he passed away briefly after. (Aug. 8, 2024 Trial Tr., Doc. 238 at 60–62).

After his death, Mr. Anderson was cremated. (Aug. 12, 2024 Trial Tr., Doc. 240 at 41; Pls.' Ex. 36). Donna Anderson testified that the cost of Mr. Anderson's cremation was $1,440. (Aug. 12, 2024 Trial Tr., Doc. 240 at 40–42; Pls.' Ex. 36).

---

[23] Defendant objected to these opinions both on the basis that Plaintiffs can only recover for "conscious" pain and suffering, and that these opinions were not offered in Dr. Schweiger's reports. (Aug. 9, 2024 Trial Tr., Doc. 239 at 28–39). The Court overruled the objection as it applied to semiconscious pain. (*Id.* at 37–39).

    The parties now have briefed the issue. The Court will allow and consider testimony of pain and suffering to the extent that Mr. Anderson appeared to have some measure of consciousness — i.e., semi-consciousness — when he could experience some true measure of the pain he was enduring.

## IV.    Conclusions of Law

All parties agree that jurisdiction and venue are proper in this Court. *See* 28 U.S.C. § 1346(b)(1) ("[T]he district courts . . . shall have exclusive jurisdiction of civil actions on claims against the United States, for money damages . . . for . . . personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.").

The parties further agree that because the malpractice in this case occurred in Georgia and in this judicial district, Georgia law applies to this case, and the parties have stipulated that all relevant VA medical providers were at all times acting within the course and scope of their employment for the United States.

### A. Federal Tort Claims Act

This case is brought against the United States under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2671 *et seq*. The FTCA provides, in relevant part:

> The United States shall be liable . . . in the same manner and to the same extent as a private individual under like circumstances, but shall not be liable for interest prior to judgment or for punitive damages.

> If, however, in any case wherein death was caused, the law of the place where the act or omission complained of occurred provides, or has been construed to provide, for damages only punitive in nature, the United States shall be liable for actual or compensatory damages, measured by the pecuniary injuries resulting from such death to the persons respectively, for whose benefit the action was brought, in lieu thereof.

28 U.S.C. § 2674.

Additionally, in actions against the United States, claimants cannot ordinarily seek an amount of monetary damages unless the claim was appropriately presented to the agency prior to filing suit. In addition, the claim ordinarily cannot be made for an amount in excess of the amount of any claim presented to the federal agency alleged to be liable. *See* 28 U.S.C. § 2675. The United States does not dispute that Plaintiffs complied with the provisions of 28 U.S.C. § 2675(a) as to the prelitigation and administrative adjudication process.

### B. Applicable Georgia Law

Under Georgia law, the four elements of negligence are: (1) a legal duty to conform to a standard of conduct, (2) a breach of that duty, (3) a legally recognized causal connection between the conduct and the resulting injury, and (4) loss or damage resulting from the alleged breach of duty. *Galanti v. United States*, 709 F.2d 706, 708–709 (11th Cir. 1983). To prevail on a negligence claim under Georgia law, a plaintiff must prove these four elements by a preponderance of the evidence. *Curtis v. United States*, 274 F. Supp. 3d 1366, 1376 (N.D. Ga. 2017).

As stated by the Georgia Court of Appeals, "a survivor's statutory claim for a decedent's wrongful death and an estate's common-law claim for the same decedent's pain and suffering are distinct causes of action." *Mays v. Kroger Co.*, 701 S.E.2d 909, 911 (Ga. Ct. App. 2010). As such, the Court considers each in turn.

### 1. Webb Anderson's Wrongful Death Claim

Plaintiff Webb Anderson, as the surviving adult child of Mr. Anderson, brings a claim for wrongful death under Georgia law. In wrongful death cases, under Georgia law, a surviving child may recover for "the full value of the life of the decedent, as shown by the evidence." O.C.G.A. § 51-4-2(a). The "full value" of a decedent's life "consists of both the economic value of the deceased's normal life expectancy as determined by his expected lifetime earnings, as well as non-economic factors incapable of exact proof or even exact definition." *Curtis*, 274 F. Supp. 3d at 1379 (quoting *Dep't of Hum. Res. v. Johnson*, 592 S.E.2d 124, 131 (Ga. Ct. App. 2003), *aff'd sub nom. Johnson v. Ga. Dep't of Hum. Res.*, 606 S.E.2d 270 (Ga. 2004)); *see also Consol. Freightways Corp. of Del. v. Futrell*, 410 S.E.2d 751, 752–53 (Ga. Ct. App. 1991) (noting that veterans, social security, and other benefits are considered income for purposes of establishing economic value).

To compute damages related to non-economic value, courts must assign value to the intangible aspects of the decedent's life, from the decedent's own perspective. *Curtis*, 274 F. Supp. 3d at 1381 (citing *Brock v. Wedincamp*, 558 S.E.2d 836, 841 (Ga. Ct. App. 2002)). In making this determination, Georgia courts typically consider the decedent's character, familial relationships, interests, and abilities. *Curtis*, 274 F. Supp. 3d at 1381 (collecting cases). This inquiry is guided by the Court's "experience and knowledge of human affairs" and is governed by the Court's "enlightened conscience." *Id.* (quoting *Futrell*, 410 S.E.2d at 752).

41

### 2. Donna Anderson's Estate Claim

Plaintiff Donna Anderson, as administrator of the estate of Mr. Anderson, brings an estate claim for personal injury to Mr. Anderson. On August 5, 2024, the Court ruled that Ms. Anderson was entitled to amend her claim pursuant to 28 U.S.C. § 2675(b) based on newly discovered evidence relevant to Mr. Anderson's pain and suffering. (Doc. 218 at 7).

By statute, medical, funeral, and other necessary expenses can be recovered by the decedent's estate on a wrongful death claim. O.C.G.A. § 51-4-5(b). Georgia law also recognizes an award of damages to the decedent's estate for pain and suffering of a decedent. *Lewis v. D. Hays Trucking, Inc.*, 701 F. Supp. 2d 1300, 1314 (N.D. Ga. 2010).

The decedent's estate "may recover for any pain and suffering, including emotional distress, that the decedent experienced prior to death." *Curtis*, 274 F. Supp. 3d at 1380. "Whether the decedent experienced conscious pain and suffering is a question for the factfinder to decide." *Andrews v. Autoliv Japan, Ltd.*, 669 F. Supp. 3d 1273, 1303 (N.D. Ga. 2021) (citing *Walker v. Daniels*, 407 S.E.2d 70, 75–76 (Ga. Ct. App. 1991), *amended on other grounds by* 2022 WL 16753148 (N.D. Ga. Sept. 30, 2022)). "The amount of damages for such pain and suffering is determined by the fair and enlightened [conscience] of the factfinder." *Curtis* 274 F. Supp. 3d at 1380 (citing *Monk v. Dial*, 441 S.E.2d 857, 859 (Ga. Ct. App. 1994)). In addition, "[t]he fright, shock, and mental suffering experienced by an individual due to wrongful acts of negligence will authorize a recovery where

attended with physical injury." *Monk*, 441 S.E.2d at 859 (citing *Candler v. Smith*, 179 S.E. 395, 399 (Ga. Ct. App. 1935)). And "even where there is no direct evidence establishing the decedent's mental state," a factfinder can infer that the decedent was aware of the severity of the situation and the impending harm, and "from these circumstances [can] extrapolate the probable mental state of [the] decedent in that last moment of consciousness." *Curtis*, 274 F. Supp. 3d at 1380 (awarding damages for emotional distress based on evidence of a decedent pilot's understanding that something was "terribly wrong" and his knowledge of the "near certainty of a crash" in the moments before an airplane crash) (citing *Monk*, 441 S.E.2d at 859).

### C. Damages Determinations

As an initial note, the Court previously orally granted Plaintiffs' Motion to Amend the Complaint. (Doc. 116). After the December 2023 sanctions hearing, when Plaintiffs filed their Amended Complaint, they increased their claimed damages from $3 million to $6 million for Plaintiff Webb Anderson's wrongful death claim, and from $1 million to $19 million for Plaintiff Donna Anderson's estate claim.

Subsequently, Defendant filed a Motion to Dismiss the Amended Complaint, on the basis that Plaintiffs' First Amended Complaint violates 28 U.S.C. § 2675 because it seeks damages in excess of the amount presented in Plaintiffs' administrative claims, and the Court therefore lacks subject matter jurisdiction to award any amount in excess of $4 million. (Doc. 175). On August 5, 2024, the Court ruled on the Motion to Dismiss, finding that due to newly discovered evidence of

Mr. Anderson's pain and suffering that was not available to Plaintiffs at the time of their administrative claim, Plaintiffs met the requirement of 28 U.S.C. § 2675(b) and could seek damages in excess of their administrative claim. (Doc. 218 at 6–7).

### 1. Webb Anderson's Damages for the Full Value of Mr. Anderson's Life and Wrongful Death

As noted above, the Court found Mr. Anderson's life expectancy to be 11.2 years. Plaintiffs presented evidence that the economic value of Mr. Anderson's life was $42,000 per year and thus $470,400 over 11.2 years of projected life expectancy. As discussed at length in the first Section of this Opinion, Mr. Anderson led a very full life that was abruptly terminated. He was devoted to his family, his former military colleagues, his work with the VA, and his support of other former soldiers across the nation. He was prepared to endure any needed medical procedures so that he could continue to fully embrace his life with his son's family, his love of fishing with his grandchildren, and his friendships and commitment to provide support for fellow veterans in Georgia and elsewhere. This was a man who was prepared to continue an active life for years more and therefore had embraced his doctors' recommendations for surgical measures that would support that goal. The Court finds the economic and non-economic value of Mr. Anderson's life to be $6 million.

### 2. Donna Anderson's Damages as Administrator of Mr. Anderson's Estate for Mr. Anderson's Pain and Suffering

Mr. Anderson endured intense suffering and terror during and after the extraordinarily flawed and negligent medical Dobhoff tube procedure, and as a

result of Defendant's erroneous administration of Ativan. He fought to overcome the suffocation he was progressively subjected to as his organ systems closed down, deprived of necessary oxygen. As Dr. Schweiger testified, Mr. Anderson suffered progressive oxygen level loss as his carbon dioxide level built up due to the misplacement of the Dobhoff tube. And, in turn, Mr. Anderson suffered physical and emotional terror and panic. Nurse Jenkins, in her statement to the AIB, described Mr. Anderson's terror as he looked up to her: his eyes communicated "help me" as his breath of life progressively diminished. Dr. Brewster similarly recognized that Mr. Anderson's vocal cord spasm and resulting inability to breathe would be experienced as drowning — a "terrifying, terrible experience." During all of this, Mr. Anderson was unable to voice his terror or move to alleviate it. In sum, as a result of the malpractice here, Plaintiff acutely suffered terror, intense discomfort, and some measure of agony as he endured the deprivation of the breath of life.[24] The Court finds that $2.7 million in damages should be awarded for pain and suffering damages. Additionally, $1,440 should be awarded to the Estate in connection with its expenses in handling Mr. Anderson's cremation.

---

[24] Plaintiffs also requested damages for pain and suffering Mr. Anderson arguably suffered when he was semi-conscious. While there is some evidence in the record that Mr. Anderson may have manifested an automatic physical reaction to touch stimulation given by medical staff in the period after the errant Dobhoff medical procedure and preceding his death, the Court finds there is no clear evidence after 3:40 pm on the day of the procedure that Mr. Anderson retained or manifested a verifiable thread of consciousness or even semi-consciousness. Accordingly, the Court declines to award damages based upon this argument advanced by Plaintiffs' counsel.

## V.    Conclusion

The Court awards $6,000,000.00 in damages for Plaintiff Webb Anderson's wrongful death claim, and $2,701,440.00 for Plaintiff Donna Anderson's estate claim. The parties have recently mediated Plaintiffs' attorneys' fees and costs solely as to the sanctions ordered by this Court in accordance with 28 U.S.C. § 2412(b) and FRCP 26 and 27. (Doc. 220). The parties plan to submit a proposed consent order and remit payment within 45 days of the mediation. The Clerk of the Court is **DIRECTED** to administratively close the case at this time. Upon the Court's entry of the parties' consent order as to the attorneys' fees and costs, the Clerk is **DIRECTED** to enter final judgment.

**IT IS SO ORDERED** this 31st day of March, 2025.

**AMY TOTENBERG**
**UNITED STATES DISTRICT JUDGE**